UNITED STATES of America, Plaintiff,

v.

Oranna Bumgarner FELTER, Defendant.

No. CR 81–00068J.

United States District Court,
D. Utah, C. D.

May 20, 1982.

William McConkie, Bruce Lubeck, Asst. U. S. Attys., Salt Lake City, Utah, for plaintiff.

Kathryn Collard, Mary Ellen Sloan, Salt Lake City, Utah, for defendant.

## MEMORANDUM OPINION

JENKINS, District Judge.

This is an appeal from the Magistrate's determination that Oranna B. Felter was fishing within the Uintah and Ouray Indian Reservation in violation of 18 U.S.C. § 1165 (1976). That section reads as follows:

> § 1165. Hunting, trapping, or fishing on Indian land
>
> Whoever, without lawful authority or permission willfully and knowingly goes upon any land that belongs to any Indian or Indian tribe, band, or group and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States that are reserved for Indian use, for the purpose of hunting, trapping, or fishing thereon, or for the removal of game, peltries, or fish therefrom, shall be fined not more than $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited.

At trial before the Magistrate, the parties were in agreement as to material facts: On July 6, 1980, a federal misdemeanor citation was issued to Oranna B. Felter by Carlin Cuch for fishing at the Bottle Hollow Reservoir within Indian country[1] and upon lands held by the United States in trust for the Ute Indian Tribe, without a tribal permit. The defendant does not deny fishing at that time and place, but asserts a legal right to do so which would negate any liability for violation of § 1165.

The defendant, formerly an enrolled member of the Ute Indian Tribe, is one of a number of Indians terminated from that status by Congress in the years following 1954. See Part I, *infra*. She asserted in proceedings before the Magistrate and again asserts here that she retains a right to fish within the Ute reservation notwithstanding the effect of the termination legislation.

Following the hearing and arguments presented below by counsel, the Magistrate determined that whatever fishing rights Oranna B. Felter had possessed as a tribal member were extinguished through the process of termination. The defendant now appeals from that determination. The parties have submitted briefs. On November

---

1. See *Ute Indian Tribe v. State of Utah*, 521 F.Supp. 1072 (D.Utah 1981).

13, 1981, counsel appeared before this Court and presented arguments. At that time, this Court took the appeal under advisement.

The Memorandum and Decision of the Magistrate entered in this case reflects care and effort in drafting and is here affirmed in many respects. However, following a careful review of the record herein, the governing legal authorities and the arguments of counsel here and before the Magistrate, this Court finds reversible error in narrow but decisive aspects of the Magistrate's decision.

## I. TERMINATION

In the 1950's Congress embarked upon an experimental approach to federal Indian policy. In an effort to reduce federal involvement and expenditure in Indian affairs, Congress terminated federal supervision and services in relation to specific tribes or groups of Indians. See Wilkinson & Biggs, "The Evolution of the Termination Policy," 5 American Indian L.Rev. 139, 145–165 (1977). Among those terminated by Congress were the "mixed blood" Utes, a group comprising approximately one-quarter of the Ute Indian Tribe of the Uintah-Ouray Reservation as it existed at that time.[2]

It is important to note that "termination" does not mean that someone's identity as an Indian is ended. Cf. *United States v. Heath*, 509 F.2d 16 (9th Cir. 1974). Rather, what is terminated is (1) eligibility for federal services made available to those recognized as "Indian," and (2) the duties and powers invested in the United States regarding the management of their affairs, or their property.[3] Termination legislation ends a *relationship* between the federal government and specific persons. It is a question of non-recognition or recognition at law of a status, not a denial of one's personal history or heritage.

This distinction is borne out in subsequent action taken by Congress in relation to various "terminated" Indians. In the Indian Education Act, for example, the term "Indian" is defined to include "a member of a tribe, band, or other organized group of Indians, *including those tribes, bands or groups terminated since 1940 . . . .*" Act of June 23, 1972, Pub.L. 92–318, Title IV, § 453, 86 Stat. 345, *now codified at* 20 U.S.C. § 1221h (supp. 1981) (emphasis added). "Terminated" Indians are counted with the unterminated for recordkeeping and providing of services under Title IV Indian education programs. See also American Indian Policy Review Comm'n, Report of Task Force on Terminated and Non-Federally Recognized Indians 1665–1670 (Comm. print 1976). As to specific groups, Congress has restored federal recognition, responsibilities and services through subsequent legislation. See Act of April 3, 1980, Pub.L. 96–227, 94 Stat. 317, *now codified at* 25 U.S.C. §§ 761 *et seq.* (supp. 1981) (the "Paiute Indian Tribe of Utah Restoration Act"); Act of Nov. 18, 1977, Pub.L. 95–195, 91 Stat. 1415, *now codified at* 25 U.S.C. §§ 711 *et seq.* (the "Siletz Indian Tribe Restoration Act"); Act of May 15, 1978, Pub.L. 95–281, 92 Stat. 246, *now codified at* 25 U.S.C. §§ 861 *et seq.* (supp. 1981) (restoration of four terminated Oklahoma tribes); Act of Dec. 22, 1973, Pub.L. 93–197, 87 Stat. 770, *now codified at* 25 U.S.C. § 903 *et seq.* (the "Menominee Restoration Act"). A congressional study commission has recommended that other groups terminated be restored to fed-

---

**2.** More precisely, the mixed-blood group comprised 27.16186% of the then-enrolled tribal membership. See *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 137 n.5, 92 S.Ct. 1456, 1463 n.5, 31 L.Ed.2d 741 (1972).

**3.** Nor is "termination" necessarily the end of *tribal* existence. See Weatherhead, "What is an 'Indian Tribe'?—The Question of Tribal Existence," 8 American Indian L.Rev. 1, 40–46 (1980). Even when Congress has enacted legislation calling for the dissolution of specific tribes, something not done by the termination

acts, the continued existence of the tribes in spite of the legislation has led to a continuation of the federal-tribal relationship. See F. Cohen, Handbook of Federal Indian Law 272–273 (1942 ed.). If tribal existence is to end, it is for the Indians to end it. Accord, *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 586–587 (2d Cir. 1979), *cert. denied*, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1980); see also *Delaware Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977).

eral status as well. See I American Indian Policy Review Comm'n, Final Report 453–454 (Comm. print 1977).

Termination, therefore, does not equate with the destruction in fact of tribal or Indian identity, nor does it equate with the uncompensated extinguishing of vested rights in property protected by the United States Constitution.[4]

The termination policy has been discredited in the eyes of both Congress and the Indians. See *e.g.,* "Menominee Restoration Act," Hearings on S. 1687 before Subcomm. on Indian Affairs of the Senate Comm. on Interior and Insular Affairs, 93d Cong. 1st Sess. (1973); "Menominee Restoration Act," Hearings on H.R. 7421 before Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs, 93d Cong. 1st Sess. (1973); Wilkinson & Biggs: "The Evolution of Termination Policy," 5 American Indian L.Rev. 139, 162–166 (1977). Even though it is against this background that the language of the Ute Termination Act must be construed, any reading of its terms is governed "by that 'eminently sound and vital canon', *Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 655 n.7, 96 S.Ct. 1793, 1797 n.7, 48 L.Ed.2d 274 (1976), that 'statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians.' *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 84, 39 S.Ct. 40, 63 L.Ed. 138 (1918)." *Bryan v. Itasca County, Minn.,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976). In determining congressional intent, we are cautioned to follow "the general rule that '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith'," *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973), *quoting Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930); *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 586, 97 S.Ct. 1361, 1362, 51 L.Ed.2d 660 (1977); *Ute Indian Tribe v. State of Utah,* 521 F.Supp. 1072, 1154 (D.Utah 1981) and cases cited therein. In this context, courts are "extremely reluctant" to find abrogation of vested Indian rights by Congress absent explicit statutory language. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 690, 99 S.Ct. 3055, 3076, 61 L.Ed.2d 823 (1979).

## II. THE UTE TERMINATION ACT

Pursuant to the Act of August 27, 1954, ch. 1009, 68 Stat. 868, *now codified at* 25 U.S.C. §§ 677–677aa (1976), the Ute Tribe was divided into two groups: those who possessed by ancestry one-half degree Ute Indian heritage and a total Indian blood quantum greater than one-half, and those who did not. 25 U.S.C. § 677c (1976). Rolls were to be prepared, listing the membership of each group. Following publication of the final rolls in the Federal Register, the Ute Indian Tribe was to consist only of those enrolled as "full-blood" members. 25 U.S.C. §§ 677d, 677g (1976). Also following such publication, both groups were to commence "a division of the assets of the tribe that are then susceptible to equitable and practicable distribution," 25 U.S.C. § 677i (1976), which would then be distributed in some manner to individuals, 25 U.S.C. § 677 (1976); "all unadjudicated or unliquidated claims against the United States, all gas, oil, and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution shall be managed jointly by the Tribal Business Committee and the authorized representatives of the mixed-blood group, ..."

---

**4.** The Fifth Amendment to the United States Constitution provides, in pertinent part:

> No person shall ... be deprived of ... property without due process of law, nor shall private property be taken for public use, without just compensation.

Any doubt that these protections extend to recognized Indian property rights has been laid to rest by *United States v. Sioux Nation of Indians,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980).

Net proceeds from the undivided assets were to be apportioned according to the ratio of persons on each roll. 25 U.S.C. § 677i.

Following distribution of the assets, property held by mixed-blood individuals or mixed-blood corporate entities [4A] was to be released from trust or restricted status and patented to the individual or corporate owner. 25 U.S.C. § 677o (1976). Section 23 of the Act, 25 U.S.C. § 677v, provides as follows:

> Upon removal of Federal restrictions on the property of each individual mixed-blood member of the tribe, the Secretary shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to such individual is terminated. Thereafter, such individual shall not be entitled to any of the services performed for Indians because of his status as an Indian. All statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to such member over which supervision has been terminated, and the laws of the several States shall apply to such member in the same manner as they apply to other citizens within their jurisdiction.

Other sections of the Act dealt with tax exemptions, water rights, alienability of individual shares, protection of the rights of minors, and certain administrative problems. See generally 25 U.S.C. §§ 677–677aa.

On August 24, 1961, the Secretary of the Interior issued the proclamation removing restrictions on mixed-blood property and terminating federal recognition of and trust responsibilities to the mixed-blood Ute Indians. 26 Fed.Reg. 8042 (August 24, 1961), VII C. Kappler, Indian Affairs: Laws and Treaties 1840 (1979).[5]

Termination of the mixed-blood Utes under the Act of August 27, 1954 has led to extensive litigation. See *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Hackford v. First Security Bank of Utah, N.A.,* 521 F.Supp. 541 (D.Utah 1981); *Ute Indian Tribe of the Uintah and Ouray Reservation v. Probst,* 428 F.2d 491 (10th Cir. 1970), *cert. denied* 400 U.S. 926, 91 S.Ct. 189, 27 L.Ed.2d 186; *Miera v. First Security Bank of Utah, N.A.,* No. C 126–73 (filed Apr. 20, 1973). However, this is the first time the fishing rights issue by itself has been raised to this level of controversy.[6]

The Ute Termination Act is silent on the subject of hunting and fishing rights. The Act has been amended three times. See Act of Aug. 2, 1956, Pub.L. 84–920, 70 Stat. 936; Act of Sept. 25, 1962, Pub.L. 87–698, 76 Stat. 597; Act of Jan. 2, 1975, Pub.L. 93–608, § 1(15), 88 Stat. 1969. None of these amendments deal with fish and game. An amendment dealing with fishing and hunting rights was suggested in 1960, but did not result in any substantial action. See letter of M. M. Zollar to F. H. Haverland, Area Director, of Mar. 2, 1960; letter in response, Mar. 15, 1960, plaintiff's Exhibits P & Q. The legislative history of the Act as well offers no meaningful illumination of the question. See Sen.Rep.No. 1632, 83d Cong., 2d Sess. (1954); H.Rep.No.2493, 83d Cong., 2d Sess. (1954). It must be

---

**4A.** These included the Ute Distribution Corp., the Rock Creek Cattle Corp. (now defunct) and the Antelope Sheep Range Corp. (now defunct).

**5.** It is ironic that while the mixed-blood Utes were being terminated from federal supervision in 1961 at the same time new directions in Indian policy were being formulated by Congress. Termination as a policy was effectively abandoned by Congress a few years later in favor of tribal self-determination within a continuing federal trusteeship. See S. Lyman Tyler, A History of Indian Policy (1973); I American Indian Policy Review Comm'n, Final Report 447 *et seq.* (Comm. print 1977).

On July 8, 1970, President Nixon expressly denounced terminations as a federal approach in dealing with Indian tribes. See President's Message to Congress, The American Indians, 116 Cong.Rec. 23131 (July 8, 1970).

**6.** In *Hackford v. First Security Bank, supra,* this Court dealt with the question of mixed-blood hunting and fishing rights in a different context. See *id.,* 521 F.Supp. at 557–558.

determined by inference whether the mixed-blood Utes retain their hunting and fishing rights as do tribal members, or have lost them through termination. If retained, this Court must determine whether they provide a complete defense to the Government's complaint herein; if lost, this Court must determine where they went.[7]

Contemporaneous administrative construction of a statute, often a helpful source for interpretation of ambiguous language, see e.g., E. I. duPont de Nemours & Co. v. Collins, 432 U.S. 46, 54–55, 97 S.Ct. 2229, 2234, 53 L.Ed.2d 100 (1977); Northern Cheyenne Tribe v. Hollowbreast, 425 U.S. 649, 660, 96 S.Ct. 1793, 1799, 48 L.Ed.2d 274 (1976), has been offered here through some of the documents found in the record. The persuasive force of the view expressed by officials of the Bureau of Indian Affairs and others during the early years of the Ute termination program on the subject of hunting and fishing rights is severely limited by the confusion and contradictions reflected in the documents. The administrative treatment of the hunting and fishing question in the 1950's reflects a number of efforts to grapple with the problem, but without a consistent theoretical basis for the views expressed.

At one time the hunting and fishing rights are deemed partitioned as appurtenances to the various lands distributed to the mixed-bloods,[8] yet are not represented in the mixed-bloods' individual shares in the two range corporations established to possess and manage these lands.[9] At other times, the mixed-blood hunting and fishing rights are thought to be extinguished by the termination of federal trust responsibility alone,[10] or by the extension of state jurisdiction over the mixed-bloods,[11] and yet are claimed in court proceedings as having been repurchased by the Ute Indian Tribe in transactions with the mixed-bloods.[12] Further, the view was expressed by officers that patenting of lands to the mixed-blood corporations would transfer control to the state of Utah and extinguish any special entitlement to hunt or fish that the mixed-bloods might have,[13] yet an agreement was proposed between the state and the mixed-bloods by which the state would assume control of fish and game on the patented lands in consideration for allowing free hunting and fishing privileges to the mixed-bloods.[14] Finally, the view was expressed that hunting and fishing rights, as an accouterment of tribal membership, were not distributed at all,[15] yet no explanation is given as to why such rights should not be deemed assets "not susceptible to equitable and practicable distribution" brought under joint management of the tribe and the Affiliated Utes by 25 U.S.C. § 677i (1976).

---

7. At oral argument, for example, counsel for the Government asserted that the fishing rights of the mixed-blood Utes could have dissipated through simple evaporation. Hearing Transcript at 29. This view is untenable, as we shall see. See Part III E, infra.

8. E.g., Tribal Resolution No. 58–163, July 16, 1958, Plaintiff's Exhibit F; Affiliated Ute Citizen Resolution No. 59–04, Jan. 12, 1959, Plaintiff's Exhibit G; letter to M. M. Zollar from W. Truswell, Nov. 20, 1959, Plaintiff's Exhibit O.

9. See Hackford v. First Security Bank of Utah, N.A., 521 F.Supp. 541, 558 (D.Utah 1981).

10. E.g., Letter to M. M. Zollar from W. Truswell, Nov. 20, 1959, plaintiff's Exhibit O.

11. E.g., Memorandum from Superintendent, Dec. 6, 1957, plaintiff's Exhibit D.

12. E.g., Joint statement of issues and facts, Affiliated Ute Citizens v. United States, Ct.Cl., Oct. 6, 1976 at 30 (Government's claim), plaintiff's Exhibit B.

13. E.g., Memorandum from Superintendent, Dec. 6, 1957, plaintiff's Exhibit D.

14. E.g., Letter of Ambrose Wash, Ute Fish and Game Board, plaintiff's Exhibit H; letter to A. Wash from Affiliated Ute Citizens, plaintiff's Exhibit I; letter to J. Phelps, State Fish and Game, from Affiliated Ute Citizens, June 17, 1959, plaintiff's Exhibit J; letter from R. Curry to Affiliated Ute Citizens, June 23, 1959, Exhibit K; Draft agreement, May 1, 1959, plaintiff's Exhibit L.

15. E.g., Letter to F. M. Haverland, Area Director, from Acting Commissioner of Ind. Aff., Sept. 28, 1960, plaintiff's Exhibit R.

■ This Court acknowledges "the settled principle that administrative interpretations of statutes are entitled to great weight," *Wilderness Society v. Morton,* 479 F.2d 842, 864 (D.C.Cir.1973) (en banc); see *Northern Cheyenne Tribe v. Hollowbreast, supra; Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973); *Volkswagenwerk Aktiengesellschaft v. F.M.C.,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), particularly as to administrative constructions contemporaneous with the legislation itself. See *Leary v. U. S.,* 395 U.S. 6, 25, 89 S.Ct. 1532, 1542, 23 L.Ed.2d 57 (1969). Such administrative construction of a statute, however, "is only one input in the interpretational equation." *Zuber v. Allen,* 396 U.S. 168, 192 (1969). A court should defer to an administrative construction only if there are no "compelling indications that it is wrong." *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969).[16] Courts are final authorities on questions of the interpretation of statutes and are not bound to follow administrative determinations that are found to be inconsistent with the statutory mandate or that frustrate congressional policy underlying a statute. See *Federal Maritime Comm'n v. Seatrain Line, Inc.,* 411 U.S. 726, 745, 93 S.Ct. 1773, 1784, 36 L.Ed.2d 620 (1973); *S.E.C. v. Sloan,* 436 U.S. 103, 117–118, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978); *Es-*

*pinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94–95, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1979); *F.T.C. v. Colgate Palmolive Co.,* 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965); *N.L.R.B. v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965); *Plateau, Inc. v. Department of the Interior,* 603 F.2d 161, 164 (10th Cir. 1979).

In this case, the administrative interpretations of the Ute Termination Act as to hunting and fishing are in conflict with each other and find little or no support in the Act itself. They conflict as well with settled principles of law governing such questions,[17] and consequently were afforded little weight, if any, in this Court's consideration of the questions presented.

## III. THE GOVERNMENT'S POSITION

The Government asserts that the defendant's claim of right should be denied for any of several reasons: (1) the defense is barred in this action by collateral estoppel; (2) that any such rights were extinguished by the final termination of the mixed-blood Utes in 1961 under 25 U.S.C. § 677v; (3) that any such rights were partitioned and distributed as appurtenant to the lands taken by the Affiliated Ute corporations, excluding the mixed-bloods from exercising such rights on lands retained by the full-bloods;[18] and (4) that not having been distributed to the corporations nor retained as an asset under joint management, the

---

16. This is true even as to administrative constructions or practices of long standing. See *e.g., Baltimore & Ohio R. Co. v. Jackson,* 353 U.S. 325, 330–331, 77 S.Ct. 842, 845, 1 L.Ed.2d 862 (1957); *United States v. E. I. duPont de Nemours & Co.,* 353 U.S. 586, 590, 77 S.Ct. 872, 875, 1 L.Ed.2d 1057 (1957); *S.E.C. v. Sloan,* 436 U.S. 103, 117–118, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978).

17. Clearly, for example, termination of federal supervision alone does not extinguish tribal hunting and fishing rights nor does it necessarily permit the wholesale extension of state authority over hunting and fishing by those persons terminated. See *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 88 S.Ct.

1705, 20 L.Ed.2d 697 (1968); *Kimball v. Callahan,* 590 F.2d 768 (9th Cir. 1979).

For this discussion, tribal interpretations have been treated as equivalent to federal administrative interpretations.

18. The United States apparently is not here asserting the view it expressed in proceedings before the Court of Claims that the Ute Indian Tribe repurchased the hunting and fishing rights appurtenant to those lands from the mixed-blood shareholders. Compare joint statement of facts and issues, *Affiliated Ute Citizens v. United States,* No. 156–68 (Ct.Cl. Oct. 6, 1976) at p. 30.

rights, if any, simply dissipated through the process of termination itself.[19]

### A. Collateral Estoppel

The Government first argues that the issues of mixed-blood Ute hunting and fishing rights were litigated and decided in the Court of Claims in 1977, and that the Court of Claims' disposition precludes litigation of the same issue in this action. In *Affiliated Ute Citizens v. United States,* No. 156–69 (Ct.Cl. filed Mar. 14, 1969), the mixed-blood Utes sought either compensation for a range of rights lost through termination, including hunting and fishing rights, or a declaration that the rights in question remained in the mixed-blood Utes in spite of termination.[20] Of primary concern in that action was whether the bar of the statute of limitations, 28 U.S.C. § 2501, prevented adjudication of the mixed-blood claims. In 1972, the Court of Claims held the claims as to most assets to be barred by the six-year statute, but reserved on the question as to water, hunting, fishing and timber rights. See *id.,* 199 Ct.Cl. 1004 (1972). Upon further development of the record, that court dismissed the remaining claims on statute of limitations grounds as well. In pertinent part, the court's order of October 28, 1977 read as follows:

> We find nothing in the record to shake our conviction that any acts for which the federal government might have been liable occurred by 1961, leaving plaintiffs' 1969 filing untimely. The purpose of the termination act was to end the tribal status of mixed-blood Utes and to convert

their status to that of ordinary American citizens. The division and distribution of assets of which plaintiffs complain were effected by 1961, all intangible assets being conveyed either in the form of shares in the Ute Distribution Corporation or as appurtenant to land; whatever claims plaintiffs may have had matured then and became barred by the statute of limitations in 1967. . . . In short, plaintiffs have pointed to no evidence, and we can find none ourselves, establishing a continual federal responsibility for claimed assets of the mixed-bloods beyond the time of the termination proclamation [1961].

*id.,* 215 Ct.Cl. 935, 936, 566 F.2d 1191 (1977). The mixed-blood Utes' claim, *if any,* against the United States for any taking of hunting and fishing rights was thus barred as arising, if at all, more than six years before the filing of the complaint in 1969. However, the Government urges here, as it argued below, that the dismissal of the *Affiliated Ute* claim was tantamount to a declaratory judgment that the mixed-blood Utes' hunting and fishing rights had indeed been taken, giving rise to a claim that is now barred. If such is not the case, counsel reasons, why didn't the Court of Claims rule that there was no claim because the rights were not taken?[21] How could a non-existent claim be barred?

This approach, while perhaps appealing at first glance, fundamentally misapprehends the nature of the Court of Claims' disposition of the *Affiliated Ute* case. The Court of Claims is granted jurisdiction over "any claim against the United States founded

---

**19.** This view was first expressed at hearing. See Hrg.Tr. at 25–31.

**20.** The approach paralleled that used in *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), in which the terminated Menominee Tribe's claim for compensation for lost hunting and fishing rights was denied on the grounds that the rights had not in fact been taken at all.

**21.** Counsel for the Government further asserted below that the denial of *certiorari* in that action by the United States Supreme Court, see

436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1977), is a controlling affirmation of the Government's view. See Transcript of Oral Arguments at 45. This Court reminds counsel of "the well-settled view that denial of certiorari imparts no implication or inference concerning the Court's view of the merits, see *Maryland v. Baltimore Radio Show,* 338 U.S. 912, 919, 70 S.Ct. 252, 255, 94 L.Ed. 562 (Frankfurter, J.)." *Hughes Tool Co. v. TransWorld Airlines,* 409 U.S. 363, 366 n. 1, 93 S.Ct. 647, 650 n. 1, 34 L.Ed.2d 577 (1973).

either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort," 28 U.S.C. § 1491 (1976), provided that the plaintiff's claim petition is filed "within six years after such claim first accrues." 28 U.S.C. § 2501 (1976). Cases falling outside of those express limitations are beyond the jurisdiction of the Court of Claims.

As the United States Court of Appeals for the Tenth Circuit has said,

> The essential inquiry in any case where the conclusive effect of an order or judgment is pleaded, is thus whether the critical issue was within the power and authority conferred upon the first tribunal to which the issue was tendered, and whether the matter pleaded as collateral estoppel was actually adjudicated.....

*Tidewater Oil Co. v. Jackson,* 320 F.2d 157, 161 (10th Cir. 1963), *cert. denied,* 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 273 (1963). A claim tendered to the Court of Claims more than six years after it accrues, regardless of its ultimate merit, is beyond the authority conferred on that court. The statute of limitations is not merely a bar to litigation of meritorious claims older than six years, it bars *all* claims, regardless of the probability that one party or the other will ultimately prevail.

To accept the Government's argument would be to place upon a party raising the defense of the statute of limitations the additional burden of showing that the opposing party indeed raises a meritorious substantive claim that is so barred. There is no support in the Judicial Code or the case law for such a view. See *e.g., Warner v. Buffalo Drydock Co.,* 67 F.2d 540, 541, 543 (2d Cir. 1933), *cert. denied,* 291 U.S. 678, 54 S.Ct. 529, 78 L.Ed. 1066 (1934); 1B Moore's Federal Practice ¶ 0.409[6] (2d ed.

rev. 1981); see also *Burnett v. New York Central R. Co.,* 380 U.S. 424, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965).

Any notion that the Court of Claims could extend its jurisdiction to grant a declaratory judgment as to the continued existence of the mixed-blood Utes' right in spite of the six-year limitations period is dispelled by *United States v. King,* 395 U.S. 1, 5, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969) in which the Supreme Court unanimously held the Court of Claims to be without power to grant declaratory judgments. The Court of Claims is empowered to hear money claims against the United States. The sense of its 1977 order in the *Affiliated Ute* case is that if the mixed-bloods had any money claims at all arising out of the Government's termination actions, they accrued more than six years before that action was commenced. That determination precluded that court from concluding anything more.

The defendant, therefore, is not precluded by collateral estoppel from raising the question of the continued existence of those rights in this forum. This Court has previously held that the Court of Claims did not determine the substantive status of the mixed-blood hunting and fishing rights and sees no reason to now retreat from that view. See *Hackford v. First Security Bank of Utah, N.A.,* 521 F.Supp. 541, 557–558 (D.Utah 1981).

**B. Extinguishment Under 25 U.S.C. § 677v**

The Government concedes that the Ute Indian Tribe possesses hunting and fishing rights recognized by the Act of Congress confirming the establishment of Uintah Indian Reservation (now the Uintah-Ouray Indian Reservation) in 1864. See Act of May 5, 1864, ch. 77, 13 Stat. 63.[22] Yet the parties have devoted considerable attention

---

**22.** Though that Act does not expressly provide for such rights, recognition of those rights is readily implied. See *Menominee Tribe of Indi-* *ans v. United States,* 391 U.S. 404, 405–406, 88 S.Ct. 1705, 1707, 20 L.Ed.2d 697 (1968); *Alaska*

to whether the Utes' existing hunting and fishing rights are "aboriginal" in origin or are a product of legislative grant. If "aboriginal," the defendant argues, congressional abrogation of those rights "cannot be lightly implied," particularly in the absence of a clear expression of legislative intent that they be extinguished. *United States v. Santa Fe Pac. R. Co.,* 314 U.S. 339, 354, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941); *United States v. Truckee-Carson Irrigation Dist.,* 649 F.2d 1286, 1298 (9th Cir. 1981); cf. *State v. Coffee,* 97 Idaho 905, 556 P.2d 1185 (1976).

In contrast, the Government asserts that any rights the defendant may have had derive from the 1864 Act and were extinguished by 25 U.S.C. § 677v, which provides that "all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to" the mixed-bloods.

This argument of origin, while of historical interest, has no bearing on the issues to be resolved in this case. Both sides agree that the Utes possess tribal hunting and fishing rights and that the 1864 Act implicitly recognizes that fact. The standards for determining whether Congress has abrogated Indian property rights are no less stringent as to rights recognized in legislation than they are as to aboriginal rights under *Santa Fe* and similar cases. See *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 690, 99 S.Ct. 3055, 3076, 61 L.Ed.2d 823 (1979); *Antoine v. State of Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); *United States v. Truckee-Carson Irrigation District, supra;* Annot., 41 A.L.R. Fed. 425 (1979); Wilkinson & Volkman, "Judicial Review of Indian Treaty Abrogation," 63 Cal.L.Rev. 601, 623–633 (1975).

Two cases relied upon by the defendant, *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), and *Kimball v. Callahan,* 493 F.2d 564 (9th Cir. 1974), cert. denied, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 and 590 F.2d 768 (9th Cir. 1979) cert. denied, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33, have applied to the 1954 termination statutes the same rules of construction applied to other legislation affecting Indians. See *Ute Indian Tribe v. State of Utah,* 521 F.Supp. 1072, 1154 (D.Utah 1981). In each case the courts found no clear expression of congressional intent that the Menominee or the Klamath tribal hunting and fishing rights be abrogated as part of the termination process. Consequently both courts held that the Indians of each group still possessed tribal hunting and fishing rights, notwithstanding even the individuals' withdrawal from tribal membership, as in the *Kimball* case. See *Kimball v. Callahan, supra,* 590 F.2d at 773.

The Government seeks to distinguish this case from the *Menominee* and *Kimball* cases by pointing out that in both of the earlier cases the rights in question were recognized by treaty while the Utes' fish and game rights are recognized by act of Congress.[23] The 1864 Act confirming the establishment of the Ute reservation, the Government asserts, is among those whose effect in relation to the mixed-bloods was to be ended by 25 U.S.C. § 677v. In effect, the Government asserts that a legislative instrument of a policy intended to reduce federal expenditures and supervisory responsibility in Indian affairs[24] silently extinguished vested Indian property rights if recognized by act of Congress, but not if the rights are recognized by treaty. Language in a treaty would thus afford greater protection for Indian rights than equivalent language in an act of Congress.

Pac. Fisheries v. United States, 248 U.S. 78, 89, 39 S.Ct. 40, 41, 63 L.Ed. 138 (1918).

**23.** Further, the Klamath Termination Act expressly excludes fishing rights from the reach of the Act. See Act of August 13, 1954, ch.

732, § 14, 68 Stat. 722, codified at 25 U.S.C. § 564m(b) (1976).

**24.** See Wilkinson & Biggs, "The Evolution of Termination Policy," 5 Am. Indian L.Rev. 139, 152–153 (1977).

The Magistrate found the results of this distinction to be "admittedly anomalous," and justifiably so. Magistrate's Memorandum and Decision, at 8. Treaties and acts of Congress are constitutional equivalents. See U.S.Const., Art. 6, ¶ 2; L. Tribe, *American Constitutional Law* § 4–4, at 168 (1978). Long ago, Chief Justice John Marshall declared that a treaty, ratified pursuant to constitutional procedures, must "be regarded in courts of justice as equivalent to an act of the legislature," if self-executing in form. *Foster v. Nielson,* 27 U.S. (2 Rct.) 253, 314, 7 L.Ed. 415 (1829). If there is an irreconcilable conflict between language of a treaty and an act of Congress, the enactment that is later in time prevails. See *Chae Chan Ping v. United States* (The Chinese Exclusion Case), 130 U.S. 581, 600, 9 S.Ct. 623, 627, 32 L.Ed. 1068 (1889); *Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888); *The Head Money Cases,* 112 U.S. 580, 599, 5 S.Ct. 247, 254, 28 L.Ed. 798 (1884); P. Freund, et al., Constitutional Law 694–695 (4th ed. 1977). Both treaties and acts of Congress are subject to constitutional limitations on the exercise of federal power. See *e.g., Reid v. Covert,* 354 U.S. 1, 18, 77 S.Ct. 1222, 1231, 1 L.Ed.2d 1148 (1957) (treaties); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) (acts).

Even as to Indian reservations, creation by treaty or by act of Congress are functional equivalents. See F. Cohen, Handbook of Federal Indian Law 294–299 (1942 ed.). Congress can create a reservation, reserve rights to the Indians and dispose of federal lands by statute as well as by treaty; whether a treaty or statute is read to create a specific right depends on its language and purpose. See *Hynes v. Grimes Packing Co.,* 337 U.S. 86, 103–104 & n. 23, 69 S.Ct. 968, 979 & n. 23, 93 L.Ed. 1231 (1949); *Confederated Band of Ute Indians v. United States,* 330 U.S. 169, 67 S.Ct. 650, 91 L.Ed. 823 (1947). As one United States Court of Appeals recently commented:

> We do not think that the distinction between a treaty and a statute has great significance. Before 1871, relations between the United States and Indians were frequently established by treaties with Indian nations which were held to be independent sovereign powers under the protection of the United States. *E.g., Worcester v. Georgia,* 1832, 31 U.S. (6 Pet.) 515, 559–560, 8 L.Ed. 483. In 1871, Congress determined that "no Indian or tribe within the United States shall be acknowledged or recognized as an independent nation, tribe or power with whom the United States may contract by treaty . . . ." 16 Stat. 566, now 25 U.S.C. § 71.

> However, first, both treaties and statutes are the supreme law of the land. Const. Art. VI, cl. 2. Second, the real power had lain with the United States alone long before 1871. Some at least of the treaties were the embodiment of orders imposed on Indians by the Executive. On occasion the United States invented tribes and appointed their chiefs. *Washington v. Washington State Commercial Fishing Vessel Association,* 1979, 443 U.S. 658, 664 n.5, 99 S.Ct. 3055, 3064 n.5, 61 L.Ed.2d 823. Third, the change from treaty to statute was at least in part the result of political infighting in Congress. The House was excluded from the treaty making process under Const. Art. II, § 2, cl. 2, and it wished to have a greater say in Indian policies. *Antoine v. Washington,* 1975, 420 U.S. 194, 202, 95 S.Ct. 944, 949, 43 L.Ed.2d 129. Fourth, as regards Indians, there is no clear cut distinction between treaties and statutes, nor any clear division between what was done by treaty and what was done by statute. Both treaties and statutes were worded in a wide variety of ways, some explicitly granting fee simple interests to tribes, some explicitly granting only Indian title (a right of occupancy at the pleasure of the United States), some saying no more than that land was reserved for Indian occupancy, some expressly reserving or granting rights, some silent on the subject. United States Department of

the Interior, Federal Indian Law, 601–622 (1958). Finally, it is clear that Congress has the power to cancel unilaterally rights granted by Indian treaty. *Lone Wolf v. Hitchcock,* 1903, 187 U.S. 553–566, 23 S.Ct. 216–21, 47 L.Ed. 299; *The Cherokee Tobacco,* 1871, 78 [8] U.S. (11 Wall) 616, 621, 20 L.Ed. 227. For all of these reasons we believe that whether the source of a right is in a treaty or in a statute is of little contemporary relevance.

*Blake v. Arnett,* 663 F.2d 906, 909–910 (9th Cir. 1981).

Prior cases evidence an identical view. In *Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975), for example, the Supreme Court held that an Act of Congress ratifying an agreement with the Colville Indians secured hunting rights under that agreement as firmly as if guaranteed by treaty. In *Arizona v. California,* 373 U.S. 546, 594–601, 83 S.Ct. 1468, 1494–1498, 10 L.Ed.2d 542 (1963), the Court recognized reserved water rights for reservations created by Act of Congress and Executive Order that are equivalent to those secured for treaty reservations. Compare *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), and see Pelcyger, "The Winters Doctrine and the Greening of the Reservations," 4 J.Contemp.L. 19 (1977).

■ Concerning Fifth Amendment protection of Indian property rights, the courts have treated recognition through treaty or statute as having equal force. "[W]here lands have been reserved for the use and occupation of an Indian Tribe *by the terms of a treaty or statute,* the tribe must be compensated if the lands are subsequently taken from them." *Sioux Tribe of Indians v. United States,* 316 U.S. 317, 326, 62 S.Ct. 1095, 1099, 86 L.Ed. 1501 (1942) (emphasis added and citations omitted); see *Sioux Nation of Indians v. United States,* 220 Ct.Cl. 442, 601 F.2d 1157 (Ct.Cl.) *affirmed;* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980); *Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 277, 75 S.Ct. 313, 316, 99 L.Ed. 314 (1955); *United States v. Creek Nation,* 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331 (1935); *Strong v. United States,* 518 F.2d 556, 563 (Ct.Cl.1975); *Minnesota Chippewa Tribe v. United States,* 315 F.2d 906, 911 (Ct.Cl.1963). Recognized title is constitutionally protected title.[25] "Congress, *acting through a treaty or statute,* must be the source of such recognition, . . . ." and if recognition of a specific right is given expressly or by implication, constitutional limits govern the termination or extinguishment of that right. *Sac and Fox Tribe of Indians of Oklahoma v. United States,* 315 F.2d 896, 897 (Ct.Cl.1963); see *United States v. Sioux Nation of Indians,* 448 U.S. 371, 415, 100 S.Ct. 2716, 2740, 65 L.Ed.2d 844 (1980); *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *Shoshone Tribe of Indians v. United States,* 304 U.S. 111, 118, 58 S.Ct. 794, 798, 82 L.Ed. 1213 (1935); *United States v. Klamath and Moadoc Tribes of Indians,* 304 U.S. 119, 123, 58 S.Ct. 799, 801, 82 L.Ed. 1219 (1938); cf. *United States v. Jim,* 409 U.S. 80, 93 S.Ct. 261, 34

---

**25.** The concept of "recognized" Indian title was recently explained as follows:

Recognized title is title to Indian lands that has been *by federal treaty or statute.* A treaty may, for example, recognize tribal title by describing a particular land area as being reserved to the tribe. That parcel may or may not have been part of the aboriginal territory of the tribe ... Where a reservation is expressly set out *by treaty or statute,* however, there is little question that the tribe has recognized title.

W. Canby, American Indian Law in a Nutshell 226 (1981) (emphasis added).

"Title which has been guaranteed by the federal government *through treaty or statute* is considered recognized title and is fully protected by the taking clause."

Clinton, "Isolated in their own Country: A Defense of Federal Protection of Indian Autonomy and Self-Government," 33 Stan.L.Rev. 979, 1037 (1981) (emphasis added).

L.Ed.2d 282 (1972).[26] But the Government's argument in this case would drive a wedge of artificial distinction between those Indian property rights recognized by Act of Congress and those recognized by treaty, a distinction neither identified by prior court decision, nor of practical or constitutional utility.

■ As in *Menominee Tribe v. United States* and *Kimball v. Callahan, supra,* the question raised here is whether Congress intended to take Indian hunting and fishing rights through the termination legislation it enacted. The Supreme Court said of the statutory language in *Menominee,*

> The provision of the Termination Act (25 U.S.C. § 899) that "all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe" plainly refers to the termination of federal supervision. The use of the words "statute" is potent evidence that no *treaty* was in mind.

*Id.,* 391 U.S. 412, 88 S.Ct. at 1710 (emphasis in original). The § 677v limitation of "statutes" to those "which affect Indians because of their status as Indians" is equally potent evidence that § 677v terminates the mixed-blood Utes' entitlement to federal services as "Indians,"[27] as well as federal jurisdiction over them as "Indians,"[28] but leaves their interests in recognized tribal property for determination pursuant to other provisions such as § 677i, if at all. This reading is in harmony with the central purposes of the termination legislation and the text of the Act itself. Like the Supreme Court in *Menominee,* this Court will readily "decline to construe the Termination Act as a backhanded way of abrogating the hunting and fishing rights of these Indians," *id.,* 391 U.S. at 412, 88 S.Ct. at 1710, at least under § 677v.

This reading of that section is further supported by legislation contemporaneous with the termination acts. In *Menominee,* for example, the Supreme Court construed the termination act in that case *in pari materia* with Public Law 83–280, Act of August 15, 1953, ch. 505, 67 Stat. 588,[29] an act of general application that provided for assumption by the states of civil and criminal jurisdiction over "Indian Country," i.e., land within federal Indian reservations, Indian allotments, or dependent Indian communities.[30] See *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation,* 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979); *Bryan v. Itasca County, Minn.,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *Kennerly v. District Court,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971); *Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655 (9th Cir. 1975).

**26.** Strangely enough, this is not true of claims based upon aboriginal title, i.e., lands which by evidence the Indians have established that they have owned since time immemorial. See *Tee-Hit-Ton Indians v. United States, supra;* Newton, "At the Whim of the Sovereign: Aboriginal Title Reconsidered," 31 Hastings L.J. 1215 (1980); Henderson, "Unraveling the Riddle of Aboriginal Title," 5 Am. Indian L.Rev. 75 (1977).

**27.** See *e.g.,* the Act of Nov. 2, 1921, ch. 115, 42 Stat. 208, *codified at* 25 U.S.C. § 13 (1976), which empowers the Bureau of Indian Affairs to spend appropriated funds "for the benefit, care, and assistance of the Indians throughout the United States," and for specified community services. See generally I American Indian Policy Review Comm'n, Final Report 367–424 (Comm. print 1977).

**28.** See *e.g.,* 18 U.S.C. §§ 1151–1165 (1976) (criminal jurisdiction) 25 U.S.C. § 2 (1976)

(powers of Comm. of Ind. Aff.); 25 U.S.C. §§ 1901 *et seq.* (1981) (Indian Child Welfare Act).

**29.** That act was amended in narrow respects in 1954, see Act of August 24, 1954, ch. 910, 68 Stat. 795 (affecting Menominee Tribe); in 1958, see Act of August 8, 1958, Pub.L. 85–615, 72 Stat. 545, and 1978, see Act of November 6, 1978, Pub.L. 95–598, 92 Stat. 2668, 2682 (both affecting Alaska); and generally in 1968, see Act of April 11, 1968, Pub.L. 90–284, §§ 401 *et seq.,* 82 Stat. 78. "Public Law 280," as amended, is now codified at 18 U.S.C. § 1162, 28 U.S.C. § 1360, and 25 U.S.C. §§ 1321–1326.

**30.** See 18 U.S.C. § 1151 (1976) ("Indian Country" defined).

Though Public Law 280 is not an example of termination legislation, see *Washington v. Yakima Indian Nation, supra,* 439 U.S. at 489 n.32, 99 S.Ct. at 755 n.32, it was certainly "intended to facilitate, not to impede, the transfer of jurisdictional responsibility to the states," wholly consistent with the termination policy. *Id.,* 439 U.S. at 490, 99 S.Ct. at 756; see Goldberg, "Public Law 280: The Limits of State Jurisdiction over Reservation Indians," 22 U.C.L.A.L.Rev. 535 (1974); 1 American Indian Policy Review Comm'n, Final Report 199–200 (Comm. print 1977). Of most significance in *Menominee* and in this case, however, are the express limitations set forth in the Act concerning state assumption of jurisdiction. Section 2(b) of that Act provides as follows:

> (b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; *or shall* deprive any Indian or any Indian tribe, band, or community of *any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.*

18 U.S.C. § 1162(b) (1976) (emphasis added). Similar language was found in § 4(b) of that Act.[31]

In *Menominee,* the Supreme Court construed the quoted language of Public Law

280 *in pari materia* with the Menominee Termination Act. The same Congress that had passed the Termination Act had enacted Public Law 280; in fact it came out of the same House and Senate committees that produced the termination legislation. *Id.,* 391 U.S. at 410–411, 88 S.Ct. at 1709. Finally, at the time Public Law 280 went into effect it was applicable to the Menominee reservation.

> Public Law 280 must therefore be considered *in pari materia* with the Termination Act. The two acts read together mean to us that, although federal supervision of the tribe was to cease and all tribal property was to be transferred to new hands, the hunting and fishing rights granted or preserved by the Wolf River Treaty of 1954 survived the Termination Act of 1954.

*Id.,* 391 U.S. at 411, 88 S.Ct. at 1710 (footnote omitted).

At page 8 of the Magistrate's Opinion it is reported that as originally enacted, "Wisconsin, where the Menominee Reservation was located, was not included as one of the designated states" [for mandatory assumption of Public Law 280 jurisdiction.] Then two months after passage of the Menominee Termination Act Public Law 280 was amended to include Wisconsin. Therefore, by its amendment the Congress removed the Menominee Indian hunting, fishing and trapping rights from the application of Section 899 of the Menominee Termination Act," a section nearly identical to § 677v of the Ute Termination Act. See p. 1006, *supra.*

This is erroneous both in fact and law. Wisconsin was always a "mandatory" P.L.

---

**31.** Section 4(b) reads as follows:

(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner

inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

See also 25 U.S.C. § 1322(b) (1976) (duplicate language).

280 state; a 1954 amendment eliminated an exclusion of the Menominee Reservation from P.L. 280 coverage. See Act of Aug. 24, 1954, 68 Stat. 795; *Menominee Tribe of Indians v. United States, supra,* 391 U.S. at 410 n.11, 88 S.Ct. at 1709 n.11. Nothing in *Menominee* indicates that it was the Court's view that Public Law 280 *removed* from the operation of § 899 right that would otherwise be affected. Rather, the language of Public Law 280 was additional evidence that Congress did not intend to extinguish those rights in the process of transferring supervision to the states in the first place.

█ Statutes are construed *in pari materia* —as relating to the same subject matter—when they "are closely related, were adopted close together in point of time, and were part of the same legislative program." *Weber v. C.M.P. Corp.,* 242 F.Supp. 321, 325 (S.D.N.Y.1965). "It is clear that 'all acts *in pari materia* are to be taken together, as if they were one law.' *United States v. Freeman,* [44 U.S.] 3 How. 556, 564 [11 L.Ed. 724]." *United States v. Stewart,* 311 U.S. 60, 64, 61 S.Ct. 102, 105, 85 L.Ed. 40 (1940). "Where two statutes are *in pari materia* and one contains provisions omitted from the other, the omitted provisions have been applied in proceedings under the statute not containing them when it is not inconsistent with that statute's purpose." *Brown v. Gilligan, Will & Co.,* 287 F.Supp. 766, 775 (S.D.N.Y.1968) (citations omitted).

> "In other words, in construing a statute, consideration may be given to its relation to other statutes, and, if reasonably practicable, a statute is to be explained in conjunction with other statutes to the end that they may be a harmonious and consistent body at law."

82 C.J.S. Statutes § 365, at pp. 799–800 (1953) (footnotes omitted). Further, as the Supreme Court has observed, "[t]here is no better key to a difficult problem of statuto-

ry construction than the law from which the challenged statute emerged. Remedial laws are to be interpreted in the light of previous experience and prior enactments." *United States v. Congress of Industrial Organizations,* 335 U.S. 106, 112–113, 68 S.Ct. 1349, 1352, 92 L.Ed. 1849 (1948) (footnotes omitted).

In *Menominee* the Court simply construed the Termination Act in light of Congress' great care to avoid abrogation of hunting, fishing and trapping rights evidenced in the express language of Public Law 280.

The Government argues that Public Law 280 not be considered in construing the Ute Termination Act for two reasons: this case does not involve treaty rights, and Utah was not a "Public Law 280" state.[32] Again, the Government reads far too narrowly. While *Menominee* on its facts dealt with rights recognized by treaty, the relevant language of Public Law 280 speaks of hunting, fishing and trapping rights recognized under "federal treaty, agreement, *or statute* ..." 18 U.S.C. § 1162(b); 25 U.S.C. § 1321(b) (emphasis added). No distinction is drawn. Public Law 280, therefore, reflects congressional concern that these rights not be infringed upon through the transfer of jurisdictional responsibility to the states, *regardless of how those rights are recognized by Congress.* Cf. *Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975). The second distinguishing ground also does not withstand close analysis.

Public Law 280 grouped the states into two categories: (1) "mandatory" states were those specifically enumerated in the Act and required to assume civil and criminal jurisdiction over "Indian country" within their borders; (2) "voluntary" states were the remaining states, who were free to assume such jurisdiction, wholly or partially, through unilateral legislative act.

---

**32.** In 1968, Public Law 280 was amended to require tribal consent to any state assumption of jurisdiction over "Indian country." See 25 U.S.C. §§ 1321(a), 1322(a) (1976). While Utah has since expressed its willingness to assume P.L. 280 jurisdiction, no Indian tribe, band or group has accepted the state's offer. See Utah Code Ann. §§ 63–36–9 *et seq.* (1978).

See *Washington v. Yakima Indian Nation, supra,* 439 U.S. at 471–474, 99 S.Ct. at 746–748.[33] Public Law 280 was "of general applicability." *Id.,* at 471, 99 S.Ct. at 746. The scope and extent of jurisdiction assumable under its provisions was uniformly the same. Had Utah chosen to accept jurisdiction over the Ute reservation after 1953, its authority—and the limits thereon—would have been identical to those of Wisconsin or other "mandatory" states. For this reason, Public Law 280 forms a meaningful backdrop for interpretation of all of the termination legislation enacted a year later by the same Congress.[34] That Utah did not choose to accept the jurisdiction made available by Congress does not translate into a conclusion that the acts are not *in pari materia* and that Congress used identical language to mean one thing as to Menominees and to mean the contrary as to the mixed-blood Utes. Compare 25 U.S.C. § 899 with 25 U.S.C. § 677v. Public Law 280 expressed a congressional policy decision to protect Indian hunting and fishing rights during any transfer of jurisdictional authority over Indians from the federal government to the states.

Nothing in the language or history of the Ute Termination Act reflects a departure—let alone a reversal—of that approach. If Congress intended to abrogate the mixed-blood Utes' hunting and fishing rights, it should have done so expressly. Where Congress has previously provided for the withdrawal of persons from tribal affiliation in particular situations, it has provided for *complete* withdrawal. Consider, for example, Section 6 of the Stockbridge-Munsee

Partition Act of 1871, Act of Feb. 6, 1871, ch. 38, 16 Stat. 404, 406. That section provided for creation of two rolls—one for "tribal" Indians, and one for "citizen" Indians who were leaving tribal affiliation. Enrollment on the "citizen" roll, the Act declared,

> shall be held as a full surrender and relinquishment on the part of the citizen party, each and every one of them, of all claims to be thereafter known or considered as members of said tribe, or in any manner interested in any provision heretofore or hereafter to be made by any treaty or law of the United States for the benefit of said tribes, and that they and their descendants shall thenceforth be admitted to all the rights and privileges of citizens of the United States.

No such complete break was prescribed by the Ute Termination Act. To the contrary, the mixed-blood Utes retained significant common interests in the management, control and proceeds of "[a]ll unadjudicated or unliquidated claims against the United States, all gas, oil, and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution" held by the Ute Tribe. 25 U.S.C. § 677i. While general statutes applicable to "Indians" because they are "Indians" no longer applied to the mixed-bloods, 25 U.S.C. § 677v, no language comparable to the Stockbridge-Munsee Act ended the mixed-bloods' interests in any provision "made by any treaty or law of the United States for the benefit of said [Ute tribe]," at least as their interests were reserved by § 677i.[35]

---

**33.** The "mandatory" states included California, Minnesota, Nebraska, Oregon, Wisconsin, and later, Alaska. *Washington v. Yakima Indian Nation, supra,* 439 U.S. at 474 & n.10, 99 S.Ct. at 748 & n.10. "Voluntary" states have included Arizona (partial), Idaho (partial), Florida (full), Montana (partial), Nevada (partial), Washington (partial), Utah (upon Indian consent) and North Dakota (upon Indian consent). 1 American Indian Policy Review Comm'n, Final Report 201–202 (comm. print 1977) (table).

**34.** The Supreme Court has already held that "[T]hese contemporaneous termination acts are *in pari materia* with Pub.L. 280." *Bryan v. Itasca County, Minn.,* 426 U.S. 373, 390, 96 S.Ct. 2102, 2111, 48 L.Ed.2d 710 (1976). This Court now holds the same as to the Ute Termination Act.

**35.** See also 25 U.S.C. § 677p (1976); which, as amended, exempts the mixed-bloods' joint asset management corporation from taxation. The Supreme Court observed in the *Affiliated Ute* case that § 677v "of course, did not pur-

This Court now refuses to find a complete abrogation of the mixed-blood Utes' hunting and fishing rights for the simple reason that Congress did not provide for one. Here, as in *Menominee*, "[w]e find it difficult to believe that Congress, without explicit statement, would subject the United States to a claim for compensation by destroying property rights conferred by treaty [or by statute], particularly when Congress was purporting by the Termination Act to settle the Government's financial obligations toward the Indians." *Id.*, 391 U.S. at 413, 88 S.Ct. at 1711 (footnote omitted). As noted above, in the absence of express congressional statement, abrogation of Indian rights is "not lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." *United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 354, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941); *Menominee Tribe of Indians v. United States, supra*, 391 U.S. at 413, 88 S.Ct. at 1711; see *United States v. Truckee-Carson Irrig. Dist.*, 649 F.2d 1286, 1298 (9th Cir. 1981); "doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith." *Choate v. Trapp*, 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941 (1912); accord, *Bryan v. Itasca County, Minn.*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976).

## C. Termination of Federal Recognition

■ Since 25 U.S.C. § 677v does not have the broad effect claimed for it by the Government, the assertion that the defendant's right to fish "was legally extinguished by the termination proclamation published August 26, 1961, [26 Fed.Reg. 8042]" Respondent's Memorandum at 7, must fall as well. Termination of federal recognition, like non-recognition in other contexts, does not by itself extinguish tribal rights, or individual interests in tribal rights. *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *Kimball v. Callahan*, 493 F.2d 564 (9th Cir. 1974); *id.*, 590 F.2d 768 (9th Cir. 1979); accord, *United States v. State of Washington*, 520 F.2d 676, 692–693 (9th Cir. 1975); *Joint Tribal Council of Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 376–380 (1st Cir. 1975); Weatherhead, "What is an 'Indian Tribe'?—The Question of Tribal Existence," 8 Am. Indian L.Rev. 1, 32–33 (1980). Nor does individual withdrawal from tribal enrollment pursuant to a termination act by itself extinguish vested hunting and fishing rights not otherwise affected by the act. See *Kimball v. Callahan (II), supra*, 590 F.2d at 773.

## D. The Appurtenance Theory

Having determined that the Ute Termination Act did not operate directly to extinguish the hunting and fishing rights of the mixed-blood group, the question of their present status is raised. The Government argues that the rights, if not directly extinguished, were distributed as rights appurtenant to the lands apportioned to the mixed-blood Utes. However, this approach misconceives the nature and scope of the tribal rights involved.

Fish and game enjoy a unique status in American law. In the early days of the Republic, lawmakers eschewed the notion that individual landowners held absolute ownership of fish and game located on their property in favor of the view expressed in Blackstone's *Commentaries*:

In the first place then we have already shown, and indeed it cannot be denied, that by the law of nature every man, from the prince to the peasant, has an equal right of pursuing, and taking to his own use, all such creatures as are *ferae*

---

port to terminate the trust status of the undivided assets. Cf. *Menominee Tribe v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968)." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 139, 92 S.Ct. 1456, 1465, 31 L.Ed.2d 741 (1972).

*naturae*,[36] and therefore the property of nobody, but liable to be seised by the first occupant. And so it was held by the imperial law, even so late as Justinian's time . . . . But it follows from the very end and constitution of society that this natural right, as well as many others belonging to man as an individual, may be restrained by positive laws enacted for reasons of state, or for the supposed benefit of the community. This restriction may be either with respect to the *place* in which this right may or may not be exercised; with respect to the *animals* that are the subject of this right; or with respect to the *persons* allowed or forbidden to exercise it. And, in consequence of this authority, we find that the municipal laws of many nations have exerted such power of restraint; have in general forbidden the entering on another man's grounds, for any cause, without the owner's leave; have extended their protection to such particular animals as are usually the objects of pursuit; and have invested the prerogative of hunting and taking such animals in the sovereign of the state only, and such as he shall authorize, . . .

2 W. Blackstone, Commentaries on the Laws of England, at 411 (1st ed. 1766) (emphasis in original; footnotes omitted); see 2 *Id.*, at 410–419; see also Lund, "Early American Wildlife Law," 51 N.Y.U.L.Rev. 703, 712 (1976). The wild animals and fish within a state's borders were deemed to be "so far as capable of ownership, owned by the state in its sovereign capacity for the common benefit of all its people. Because of such ownership, and in the exercise of its police power the States may regulate and control the taking, subsequent use and property rights that could be acquired therein." *Lacoste v. Department of Conservation,* 263 U.S. 545, 549, 44 S.Ct. 186, 187, 68 L.Ed. 437 (1924); see *Geer v. Connecticut,* 161 U.S. 519, 522–530, 16 S.Ct. 600, 601–604, 40 L.Ed. 793 (1896), overruled by

*Hughes v. Oklahoma,* 441 U.S. 322, 325, 99 S.Ct. 1727, 1730, 60 L.Ed.2d 250 (1979). As the Supreme Court of California declared years ago in *Ex parte Maier,* 103 Cal. 476, 37 P. 202 (1894):

The wild game within a State belongs to the people in their collective sovereign capacity. It is not the subject of private ownership except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or traffic and commerce in it if it is deemed necessary for the protection or preservation of the public good.

*Id.,* 37 P. at 404. Or, as the Supreme Court of Minnesota observed,

We take it to be the correct doctrine in this country, that the ownership of wild animals, so far as they are capable of ownership, is in the State, not as proprietor but in its sovereign capacity as the representative and for the benefit of all its people in common.

*State v. Rodman,* 58 Minn. 393, 59 N.W. 1098, 1099 (1894).

The most recent trend in analysis of cases arising under the Commerce Clause has been away from notions of state "ownership" of fish and game. See *Hughes v. Oklahoma,* 441 U.S. 322, 325–335, 99 S.Ct. 1727, 1730–1735, 60 L.Ed.2d 250 (1979). In *Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 284, 97 S.Ct. 1740, 1751, 52 L.Ed.2d 304 (1977), the Supreme Court commented,

In any event, "[t]o put the claim of the State upon title is," in Mr. Justice Holmes' words, "to lean upon a slender reed." *Missouri v. Holland,* 252 U.S. 416, 434 [40 S.Ct. 382, 384, 64 L.Ed. 641] (1920). A State does not stand in the same position as the owner of a private game preserve and it is pure fantasy to talk of "owning" wild fish, birds, or animals. Neither the States nor the Federal Government, any more than a hopeful fisherman or hunter, has title to these

---

**36.** *I.e.,* "[o]f a wild nature or disposition. Animals which are by nature wild are so designated, by way of distinction from such as are naturally tame, the latter being called '*domitae naturae*'." Black's Law Dictionary 558 (5th ed. 1979).

creatures until they are reduced to possession by skillful capture. *Ibid.; Geer v. Connecticut,* 161 U.S. 519, 539–540 [16 S.Ct. 600, 608, 40 L.Ed. 793] (1896) (Field, J. dissenting). The "ownership" language of cases such as those cited by appellant must be understood as no more than a 19th-century legal fiction expressing "the importance to its people that a state have power to preserve and regulate the exploitation of an important resource." *Toomer v. Witsell,* 334 U.S. [385] at 402 [68 S.Ct. 1156 at 1165, 92 L.Ed. 1460]; see also *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 420–421 [68 S.Ct. 1138, 1143, 92 L.Ed. 1478] (1948). Yet the Court has taken care to point out that "[t]he fact that the State's control over wildlife is not exclusive and absolute in the face of federal regulation and certain federally protected interests does not compel the conclusion that it is meaningless in their absence." *Baldwin v. Montana Fish and Game Comm'n,* 436 U.S. 371, 386, 98 S.Ct. 1852, 1861, 56 L.Ed.2d 354 (1978). Far from it. In fact, "[s]o long as constitutional requirements have been met, . . . '[p]rotection of the wild life of the State is peculiarly within the police power, and the State has great latitude in determining what means are appropriate for its protection,' *Lacoste v. Department of Conservation,* 263 U.S. 545, 552, 44 S.Ct. 186, 188, 68 L.Ed. 437 (1924)." *Id.,* 436 U.S. at 391, 98 S.Ct. at 1864 (footnote omitted). In *Baldwin,* for example, the court observed that "[t]he elk supply, which has been entrusted to the care of the State by the people of Montana, is finite and must be carefully tended in order to be preserved," and that regulatory "means not unreasonably related to the preservation of a finite resource and a substantial regulatory interest of the State" are therefore justified. *Id.,* 436 U.S. at 388, 390, 98 S.Ct. at 1862, 1863.

The common thread running through the case law on fish and game as it evolves is recognition of substantial interest of the sovereign[37] in managing and conserving fish and game as an important common natural resource, including the power to regulate the efforts of persons to reduce wild fish and game to actual possession, through licensing and otherwise.

This principle and the analysis behind it are important herein because it in large part defines the nature of "hunting and fishing rights." Wildlife law in large part is resource management. See *Baldwin v. Montana Fish and Game Comm'n, supra; Hughes v. Oklahoma, supra,* 441 U.S. at 335–336, 99 S.Ct. at 1735; Lund, "Early American Wildlife Law," 51 N.Y.U.L.Rev. 703, 730 (1976).

Within the sphere of overall state regulatory authority a landowner has the exclusive right to take fish and game that is found upon his property; "the owner of the soil would have a qualified, but substantial, property interest in the fish upon his own land, with the exclusive right to reduce it to possession superior to that of others, and subject only to regulation by the state as a sovereign and under its police powers." *Gratz v. M'Kee,* 270 F. 713, 718 (C.C.A. 8th Cir. 1920), *affirmed* 260 U.S. 127, 43 S.Ct. 16, 67 L.Ed. 167 (1922); accord, *State ex rel. State Game Comm'n v. Red River Valley Co.,* 51 N.M. 207, 182 P.2d 421 (1945); 36A C.J.S. Fish § 4 (1961).

When land is conveyed to others, the conveyance of fishing rights may run as an appurtenance to land, *e.g., Upper Greenwood Lake Properties Ass'n v. Grozing,* 6 N.J.Super. 538, 69 A.2d 896 (1949), as a personal right, *e.g., Haynes v. Hunt,* 96 Utah 348, 85 P.2d 861, 866 (1938), or not at

---

37. The principle is not limited to the states. The federal government may exercise substantial authority in this area, see *e.g., Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920); *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); as may Indian tribes, *United States v. State of Washington,* 520 F.2d 676, 686–687 (9th Cir. 1975); *Montana v. United States,* 450 U.S. 544, 557–567, 101 S.Ct. 1245, 1254–1259, 67 L.Ed.2d 493 (1981).

all, *e.g., Camp Clearwater, Inc. v. Plock,* 52 N.J.Super. 583, 146 A.2d 527 (1958), depending upon the terms of the conveyance. 36A C.J.S. Fish § 5 (1961). What passes as an appurtenance, if at all, is the right to take fish or game on the land in an otherwise lawful manner *to the exclusion of others.*[38]

However, as this Court has previously observed, Indian hunting and fishing rights reflect "a hybrid mixture of Indian jurisdictional and proprietary interests." *Ute Indian Tribe v. State of Utah,* 521 F.Supp. 1072, 1145 (D.Utah 1981). Besides the proprietary right of an Indian tribe to permit or refuse entry by outsiders to hunt fish or gather upon tribal lands, see *Montana v. United States,* 450 U.S. 544, 557–567, 101 S.Ct. 1245, 1254–1258, 67 L.Ed.2d 493 (1981), and to take fish and game thereon as an incident of Indian title, see *United States v. Minnesota,* 466 F.Supp. 1382, 1385 (D.Minn.1979), *affirmed Red Lake Band of Chippewa Indians v. State of Minnesota,* 614 F.2d 1161 (8th Cir. 1980) (per curiam), *cert. denied,* 449 U.S. 905, 101 S.Ct. 279, 66 L.Ed.2d 136 and as recognized by treaty or statute, see F. Cohen, Handbook of Federal Indian Law 285–286 (1942 ed.), the tribe stands within its territory and jurisdiction in the role of the state, as sovereign, with equivalent authority to control the use of, and provide for conservation of the fish and game resources. State regulation of Indian hunting and fishing on Indian lands is consequently excluded. See *Cheyenne-Arapaho Tribes v. State of Oklahoma,* 618 F.2d 665, 669 (10th Cir. 1980); *United States v. State of Washington,* 520 F.2d 676, 686 (9th Cir. 1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976).[39]

The rights and powers in question are *tribal* rights and powers; in fact, the basic unit of the federal-Indian relationship is the tribe. Clinton, "Isolated in Their Own Country: A Defense of Federal Protection of Indian Autonomy and Self-Government," 33 Stan.L.Rev. 979, 984–985 (1981); see *United States v. State of Washington, supra,* 520 F.2d at 691. An individual Indian's hunting or fishing right is measured wholly in relation to the nature and extent of the tribe's right. *Id.,* F. Cohen, Handbook of Federal Indian Law 185 (1942 ed.).[40] Tribal rights in property are owned by the tribal entity, and not as a tenancy in common of the individual members, see *e.g., Fleming v. McCurtain,* 215 U.S. 56, 30 S.Ct. 16, 54 L.Ed. 88 (1909); F. Cohen, Handbook of Federal Indian Law 288 (1942 ed.), including hunting and fishing rights. *United States v. State of Washington, supra,* 520 F.2d at 688, 691; *White-*

---

**38.** Or, what may be reserved by a grantor is a right in profits *a prendre* in lands conveyed. A right of profits *a prendre* is a right "to make some use of the soil of another, . . . and it comes with it the right of entry and the right to remove and take from the land the designated products or profit and also includes right to use such of the surface as is necessary and convenient for exercise of the profit." Black's Law Dictionary 1090 (Std. ed. 1979), citing *Costa Mesa Union Sch. Dist. v. Security First Nat'l Bank,* 254 Cal.App.2d 4, 62 Cal.Rptr. 113, 118 (1967).

**39.** In the absence of tribal regulation, or in situations calling for joint management of the fishing resources, the states may regulate Indian fishing or hunting if a specific regulation is reasonable, non-discriminatory and a "necessary conservation measure." *Puyallup Tribe v. Washington Game Dep't,* 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 2689 (1978); *Washington Game Dep't. v. Puyallup Tribe,* 414 U.S. 44, 45, 94 S.Ct. 330, 331, 38 L.Ed.2d 254 (1973); *Pu-*

*yallup Tribe v. Washington Game Dep't.,* 433 U.S. 165, 176, 97 S.Ct. 2616, 2623, 53 L.Ed.2d 667 (1977); *Antoine v. State of Washington,* 420 U.S. 194, 207, 95 S.Ct. 944, 951, 43 L.Ed.2d 129 (1975).

**40.** The cases cited by the Government are for this reason inapposite. *United States v. Minnesota,* 466 F.Supp. 1382 (D.Minn.1979), *affirmed* 614 F.2d 1161 (8th Cir. 1980), *cert. denied* 449 U.S. 905, 101 S.Ct. 279, 66 L.Ed.2d 136, and *State v. Hero,* 282 N.W.2d 70 (S.D.1979) deal with wholesale transfers of tribal territory and jurisdiction to the United States including the hunting and fishing rights in the ceded areas. As stated in *The Cherokee Trust Funds,* 117 U.S. 288, 308, 6 S.Ct. 718, 726, 29 L.Ed. 880 (1886), "Their treaties of cession must, therefore, be held not only to convey the common property of the Nation, but to divest the interest therein of each of its members."

*foot v. United States,* 293 F.2d 658, 661–663 & nn. 8–9 (1961), *cert. denied,* 369 U.S. 818, 82 S.Ct. 829, 7 L.Ed.2d 782 (1962). As the Court of Claims explained in *Journeycake v. Cherokee Nation,* 28 Ct.Cl. 281, 302 (1893) *affirmed,* 155 U.S. 196, 15 S.Ct. 55, 39 L.Ed. 120 (1894):

> The distinctive characteristic of [tribal] communal property is that every member of the community is an owner of it as such. He does not take it as heir, or purchases, or grantee; if he dies his right of property does not descend; if he removes from the community it expires; if he wishes to dispose of it he has nothing he can convey; and yet he has a right of property in the lands as perfect as that of any other person; and his children after him will enjoy all that he has enjoyed, not as heirs but as communal owners.

■ Though individuals possess no interest in tribal lands as tenants in common, "[i]n all these cases, the individual enjoys a right of user derived from the legal or equitable property right of the tribe in which he is a member." F. Cohen, Handbook of Federal Indian Law 185 (1942 ed.).[41]

> The tribal lands belonged to the tribe. The legal title stood in the tribe as a political society; but those lands were not held by the tribe as the public lands of the United States are held by the nation. They constituted the home or seat of the tribe. Every member, by virtue of his membership in the tribe, was entitled to dwell upon and share in the tribal property. It was granted to the tribe by the federal government not only as the home of the tribe, but as a home for each of the members.

*Shulthis v. McDougal,* 170 F. 529, 533 (8th Cir. 1909), *affirmed,* 225 U.S. 561, 32 S.Ct.

704, 56 L.Ed. 1205 (1912); see *Cherokee Nation v. Hitchcock,* 187 U.S. 294, 307, 23 S.Ct. 115, 119, 47 L.Ed. 183 (1902). Hunting and fishing rights, too, are tribal rights held for the common benefit of all tribal members:

> The treaty was with the tribe; but the right of taking fish at all places within the reservation, and usual and accustomed grounds and stations outside the reservation, was plainly a right common to members of the tribe—a right to a common is the right of an individual of the community.

*Mason v. Sams,* 5 F.2d 255, 258 (W.D.Wash. 1925). The significance of this principle for terminated Indians is highlighted in *Kimball v. Callahan (II),* 590 F.2d 768, 773 (9th Cir. 1979) by the United States Court of Appeals for the Ninth Circuit:

> From *Mason* it is clear that an individual Indian enjoys a right of user in tribal property derived from the legal or equitable property right of the Tribe of which he is a member. See also F. Cohen, *Handbook of Federal Indian Law* 185 (1945) . . . . Prior to the Termination Act, the Klamath Tribe held treaty hunting, fishing, and trapping rights within its reservation in which the individual members of the Tribe held rights of user. The Termination Act did not affect those rights. That an individual member withdrew from the Tribe for purposes of the Termination Act did not change his relationship with the Tribe as to matters unaffected by the Act, e.g., treaty hunting, fishing and trapping rights . . . . [footnote omitted].

Though the Government seeks to distinguish *Kimball v. Callahan* because of differences in language of the relevant statutes,[42]

---

**41.** The *Handbook of Federal Indian Law* presents an extensive discussion of individual rights in tribal property, including hunting and fishing rights. See *id.,* at 183–194, 285–286, 288–289.

**42.** The Klamath Termination Act allowed members the option of withdrawing from tribal

membership and provided that one who withdrew would "have his interest in tribal property converted into money and paid to him," 25 U.S.C. § 564d(a)(2), and would cease to be a member of the tribe, except as to participation in proceeds of tribal claims against the United States. 25 U.S.C. § 564e(c). Only the express exception for fishing and other treaty rights, 25

this Court finds the reasoning of *Kimball* to be readily applicable to circumstances herein. While withdrawal from membership in the tribe would generally result in the extinguishment of all individual rights of user in tribal property, see 1 Opinions of the Solicitor of the Dep't. of Interior Relating to Indian Affairs 811–812 (1979), the Ute Termination Act called at most for only an incomplete withdrawal from the rights of tribal membership. Section 677d of the Act provided that mixed-blood members enrolled on the final mixed-blood roll "shall have no interest [in the tribe] *except as otherwise provided* in sections 677–677aa of this title," i.e., the entire Ute Termination Act. (Emphasis added.) The mixed-bloods retained interests in common with the tribal membership in oil, gas, and mineral resources of every kind, all unadjudicated or unliquidated claims against the United States, "and all other assets not susceptible to equitable and practicable distribution". 25 U.S.C. § 677i.

Are hunting and fishing rights susceptible to "equitable and practicable distribution" between the mixed-bloods and the tribe? As noted previously, one of the qualities of Indian hunting and fishing rights on Indian lands that renders them specially significant is that the power to regulate and license the exercise of those rights rests with the tribe rather than the state.[43] See *United States v. State of Washington, supra,* 520 F.2d at 686–688.

Aside from the right to hunt or fish on tribal lands to the exclusion of others, see *United States v. Pollman,* 364 F.Supp. 995, 1001 (D.Mont.1973), the tribe possesses the discretion inherent in the police power to regulate and allocate the fish and game resources as it sees fit, within the constraints imposed by law.[44] Is that authority readily susceptible to "equitable and practicable distribution", i.e., to wholesale delegation? Probably not. See 16 C.J.S. Constitutional Law § 179 (1956); cf. *Utah Manufacturers' Ass'n. v. Stewart,* 82 Utah 198, 23 P.2d 229, 232 (1933). Nothing in the Act, or in the organizational documents of the mixed-blood corporations reflects any such intent.[45]

■ The right of user in tribal hunting and fishing rights that Oranna B. Felter and the other mixed-bloods possessed as tribal members was a *personal* right. It was neither alienable, assignable, transferable nor descendible. As the Supreme Court said in *Gritts v. Fisher,* 224 U.S. 640, 32 S.Ct. 580, 56 L.Ed. 928 (1912),

> [T]he lands and funds belonged to the tribe as a community, and not to the members severally or as tenants in common. The right of each individual to participate in the enjoyment of such property depended upon tribal membership, and when that was terminated by death or otherwise the right was at an end. It was not alienable or descendible. And when children were born into the

---

U.S.C. § 564m(b), excluded those rights of user from the operation of § 564e(c). *Kimball v. Callahan, supra,* 493 F.2d at 569; 590 F.2d at 772. As is shown *infra,* however, the position of the mixed-blood Utes more closely resembles that of the Klamaths who did not elect to withdraw from the tribe, but instead chose to retain an interest in the ongoing management of a portion of the tribal assets.

**43.** As the Court said in *Mason v. Sams, supra,*
> The state owns the fish and the game of the state, and may regulate or license the right to take them, or forbid it entirely. But the fish in the waters of this stream do not belong to the state, nor to the United States; *but to the Indians of this reservation.*

5 F.2d at 258 (emphasis added).

**44.** The tribe, for example, may not destroy a wildlife resource held in common with the state, see *Washington Game Dep't. v. Puyallup Tribe,* 414 U.S. 44, 49, 94 S.Ct. 330, 333, 38 L.Ed.2d 254 (1973).

**45.** An early proposal to provide for mixed-blood regulation of hunting and fishing on mixed-blood lands was abandoned as unworkable. See n.8, *supra.* The shares in the mixed-blood corporations do not speak of hunting and fishing, and have apparently never served the dual purpose of a hunting or fishing license. See *Hackford v. First Security Bank of Utah, N.A.,* 521 F.Supp. 541, 558 (D.Utah 1981).

tribe they became thereby members and entitled to all the rights incident to that relation. . . .

*Id.,* 224 U.S. at 642, 32 S.Ct. at 581.

If the mixed-bloods' rights of user were partitioned as appurtenant to land, why wouldn't they be alienable and descendible, like the land itself? The right to hunt and fish upon one's own land to the exclusion of others, subject to sovereign regulation, may certainly be deemed appurtenant to land, but it is a right normally inherent in private ownership, be the owner Indian or not. See 36A C.J.S. Fish § 4.[46] The defendant possessed special, additional rights inhering in tribal membership, rights which were personal in her and could not pass as an appurtenance to corporate lands.

To say that the defendant's right of user was delimited by the Act to being exercised only upon those lands partitioned to the mixed-bloods is to say that her personal right of user was diminished to 27% of its former scope.[47] The parallel right of an enrolled full-blood, on the other hand, would be reduced following partition to 73% of its former scope. However "practicable"

this distribution might be, it is hardly "equitable"—as demanded by the Act.[48]

Treated as an appurtenance to land and as being without tribal character, the defendant's right to hunt and fish would be subject to the full panoply of state licensing and other restrictions, a circumstance tantamount to an extinguishment of the right altogether. As a right of user in tribal rights—a right of user personal to the defendant—it would remain subject to *tribal* regulation, whether on[49] or off[50] of tribally or Indian owned lands. It would be subject at most to minimal state regulation. See *Kimball v. Callahan, supra,* 590 F.2d at 776–777. Such a right is incapable of practicable and equitable distribution under § 677i; *it has already been distributed as a right personal to the defendant* as a function of her earlier tribal membership—as a right not extinguished by the Termination Act and certainly not abandoned. It remains a right in common with tribal members and other mixed-bloods similarly situated. Inhering in this right is a right of profits *a pendre* in the lands of the tribe, a right to enter those lands as necessary and convenient to the obtaining the profits, i.e., to

---

**46.** A landowner possesses no such exclusive right to harvest fish in adjoining *public* waters. See *e.g., State ex rel. State Game Comm'n v. Red River Valley Co.,* 51 N.M. 207, 182 P.2d 421, 463–464 (1945); 36A C.J.S. Fish § 6 (1961); see also *State v. San Luis Obispo Sportsman's Ass'n,* 22 Cal.3d 440, 584 P.2d 1088, 1091–1094, 149 Cal.Rptr. 482 (1978).

There is an apparent exception to this rule: oyster beds have been held to be appurtenant to land, including lands beneath public waters, permitting the riparian owner an exclusive right of harvest. "[T]here is a marked distinction between the right in relation to floating fish, and the right of dredging for oysters. The latter is entirely local and connected with the soil. . . ." *Martin v. Waddell,* 41 U.S. (16 Pet.) 367, 433, 10 L.Ed. 997 (1842); cf. *McKee v. Gratz,* 260 U.S. 127, 135, 43 S.Ct. 16, 17, 67 L.Ed. 167 (1922) (Holmes, J. on mussels and land).

**47.** As a member, the defendant had the right to hunt and fish on *all* tribal lands, subject to tribal regulation. .

**48.** While Congress may alter or enlarge a pool of beneficiaries of a distribution of tribal prop-

erty, it may not confiscate such property without incurring liability for just compensation. See generally *United States v. Jim,* 409 U.S. 80, 93 S.Ct. 261, 34 L.Ed.2d 282 (1972); *Delaware Tribal Business Comm. v. Weeks,* 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977). In distributions of tribal property to individuals, Congress has generally prescribed an equal division per capita. F. Cohen, Handbook of Federal Indian Law 192 (1942 ed.).

**49.** *United States v. State of Washington, supra,* 520 F.2d at 686–688; *United States v. Jackson,* 600 F.2d 1283, 1288 (9th Cir. 1979); *Mescalero Apache Tribe v. State of New Mexico,* 677 F.2d 55 (10th Cir. 1982) (hunting & fishing); *id.,* 630 F.2d 724 (1980).

**50.** See *Settler v. Lameer,* 507 F.2d 231 (9th Cir. 1974); cf. *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Of course, on lands not a part of the Ute reservation at all, state regulation would be fully applicable. See generally *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–149, 93 S.Ct. 1267, 1270, 35 L.Ed.2d 144 (1973).

hunt and fish subject to lawful regulation. See note 38, *supra.*

Individual mixed-blood Utes enrolled upon the final mixed-blood Roll (and still living) are thus entitled to hunting and fishing privileges within the Ute reservation [51] equivalent to those afforded members of the tribe as now defined. As each of the mixed-blood Utes passes away, his or her personal right of user is extinguished, it being neither inheritable or transferable. See F. Cohen, Handbook of Federal Indian Law 185 (1942 ed.).

This result is wholly consistent with the letter and policy of the Ute Termination Act. The aggregate fish and game entitlement of the mixed-blood Utes will never exceed an approximate 27% share of the harvestable fish or game for the simple reason that the mixed-bloods represented no more than that percentage of the entitled group. Attrition will eventually extinguish the mixed-blood entitlement through the normal course of events.[52] This is an equitable distribution of the rights involved. Ultimately the interests of the mixed-bloods in those rights will be ended. Recalling that the thrust of termination was to end federal *supervision* of Indian assets, not to extinguish the Indians' rights without just compensation, the continuing right of user concept accomplishes that end without incurring inequities, administrative complications, or liability under the Fifth Amendment.[53] Accord, *Kimball v. Callahan, supra; Menominee Tribe of Indians v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968).

In contrast, to follow the view advanced by the Government would be to inequitably diminish the rights possessed by the defendant and others, to render an appurtenance to land a right that is essentially personal—conceivably creating a power to alienate or inherit those rights where none otherwise exists. If any tribal asset demands unified control and management it is the tribal interest in fisheries and game herd management. To hold that the entirety of the mixed-blood Utes' hunting and fishing rights, including the power of control, see pages 1023–1024 *supra,* was partitioned as an appurtenance to the mixed-blood range lands would fracture such unified management, potentially yielding the kind of confusion between federal, state and tribal officials that developed in the late 1950's. This is the kind of "absurd and impractical result" that courts are counselled to avoid in construing statutes and in making sense of ambiguous language. See *e.g. United States v. Kirby,* 74 U.S. (7 Wall.) 482, 486–487, 19 L.Ed. 278 (1868); *Melong v. Micronesian Claims Commission,* 186 U.S.App. D.C. 391, 569 F.2d 630, 634 (1978); *Church of Scientology of Cal. v. United States Dep't of Justice,* 612 F.2d 417, 421 (9th Cir. 1979); *Government of Virgin Islands v. Berry,* 604 F.2d 221, 225 (ed Cir. 1979).

The continuing right of user concept, on the other hand, protects tribal authority over its own hunting and fishing rights and allows for uniform regulation of their exercise.[54] Those who are entitled to such a right are readily identified from the published final mixed-blood roll. See 21 Fed.

**51.** See *Ute Indian Tribe v. State of Utah,* 521 F.Supp. 1072, 1188 (D.Utah 1981) (map).

**52.** The children of persons listed on the mixed-blood roll would *not* enjoy the entitlement had by their parents. If they are to exercise any such tribal right that may occur only through direct affiliation with the tribe as members. See F. Cohen, Handbook of Federal Indian Law 185 (1942 ed.).

**53.** While the Court of Claims held in *Affiliated Ute Citizens v. United States,* 215 Ct.Cl. 935, 936, 566 F.2d 1191 (Oct. 28, 1977) (order) that

any claims arising out of termination are barred by the statute of limitations, such limitations—even the *res judicata* effect of prior judgments—may be set aside by Congress, allowing litigation. *E.g., Sioux Nation of Indians v. United States,* 448 U.S. 371, 390–407, 100 S.Ct. 2716, 2728–2736, 65 L.Ed.2d 844 (1980).

**54.** The tribe may not invidiously discriminate against persons holding equivalent rights. See generally, *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

Reg. 2208–2212 (April 5, 1956). Finally, the tribal hunting and fishing resource is apportioned between the mixed-blood and full-blood groups with precise equity, and the mixed-blood share will be extinguished in the normal course of events.

### E. Dissipation Of Rights

The Government at hearing asserted that the hunting and fishing rights, if not otherwise extinguished, have simply dissipated and no longer exist. This dissipation, it is urged, is an aftershock at the exercise of the plenary power of Congress over Indian affairs. See Hrg.Tr. at 25–31.

However, the result accomplished under the Ute Termination Act is analogous to that achieved under prior legislation which preserved individual rights to share in tribal property while otherwise altering or terminating the individual's relationship with the tribe. See F. Cohen, Handbook of Federal Indian Law 186–187 (1942 ed.). It contrasts sharply with other legislation that expressly provided for complete severance of tribal relations to an individual. See e.g., Act of February 6, 1871, ch. 38, 16 Stat. 404 (Stockbridge-Munsee) discussed *supra* at 1017. While Congress may have the power to wholly partition the tribal estate,[55] see *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903), it must express its intent to do so in plain and unambiguous terms. See *United States v. Santa Fe Pac. R. Co.,* 314 U.S. 339, 353, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941). Congress has taken a markedly different approach to the mixed-blood Utes and until Congress makes

some different disposition of their interests, the enrolled mixed-blood Utes, including Oranna B. Felter, retain their rights of user in the tribal hunting and fishing estate, a right of profits a prendre in tribal lands, subject to overall tribal control.[56] Compare *Kimball v. Callahan, supra,* 590 F.2d at 773.

### IV. EFFECT ON THIS CASE

Though entitled to the fishing rights of a member of the tribe, Oranna B. Felter is no longer so enrolled, nor is she federally recognized as "Indian." Her situation is, therefore, distinguishable from that of the defendant in *United States v. Jackson,* 600 F.2d 1283 (9th Cir. 1979), in which the United States Court of Appeals for the Ninth Circuit held that 18 U.S.C. § 1165 was not applicable to tribal members who hunted in violation of tribal regulations. Tribal jurisdiction over such minor offenses remains exclusive. *Id.,* at 1286–1288; *United States v. Wheeler,* 435 U.S. 313, 323–326 & nn. 20–23, 98 S.Ct. 1079, 1086–1087 & nn. 20–23, 55 L.Ed.2d 303 (1978). Indian tribes lack jurisdiction to try and punish non-Indians for criminal offenses, see *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 209, 98 S.Ct. 1011, 1021, 55 L.Ed.2d 209 (1978) and 18 U.S.C. § 1165 was designed to fill that gap in enforcement powers as to non-Indians hunting or fishing on tribal or other Indian lands without tribal permission. *Id.,* 435 U.S. at 206, 98 S.Ct. at 1019; *United States v. Jackson, supra,* at 1286–1287. Because of the Termination Act, Oranna B. Felter would fall into the "non-Indian" category.[57]

To convict for violation of 18 U.S.C. § 1165, however, the Government must es-

---

**55.** This power is subject, of course, to constitutional and other limitations. See *United States v. Sioux Nation of Indians,* 448 U.S. 371, 409–416, 100 S.Ct. 2716, 2737–41, 65 L.Ed.2d 844 (1980); Kearl, "Congressional Power, Trust Responsibilities and Judicial Review in Indian Affairs," 2 J. Energy L. & Policy 45 (1981).

**56.** Allocation of the right among those entitled to share therein might well be supervised under the joint management plan outlined in 25 U.S.C. § 677i. While as the Government points out, the harvest of fish and game is not strictly "proceeds" of tribal property, it is cer-

tainly a "profit" in the property law sense of that term. Joint supervision of the mixed-bloods' right of profit a prendre in the tribal lands, subject to the tribe's paramount police power, may ease any friction that may arise.

**57.** Nothing in *Oliphant,* of course, exempts non-Indians from tribal *civil* jurisdiction over reservation lands. See *Merrion v. Jicarilla Apache Tribe,* —— U.S. ——, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982); *Montana v. United States,* 450 U.S. 544, 565–566, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981).

tablish that Oranna B. Felter (or another defendant similarly accused) was not in fact exercising the rights retained by her as explained in this opinion. This Court does not contemplate that an individual's enjoyment of tribal fishing rights "could be lost because of an infraction of tribal rules which do not relate to the actual manner of exercising those rights." *State v. Goodell,* 38 Or.App. 511, 590 P.2d 764, 765–766 (1979); *State v. Gowdy,* 1 Or.App. 424, 462 P.2d 461 (1969). To convict a mixed-blood Ute enrolled upon the final mixed-blood roll of hunting or fishing in violation of 18 U.S.C. § 1165, the Government must establish that the defendant was acting in violation of an applicable tribal regulation as to the time, method and manner of fishing or hunting by tribal members.

Upon review of the record in this case, this Court must find that as a matter of law the conviction cannot be sustained due to the failure of the Government to overcome the defendant's claim of right. A finding of conviction upon this record, in light of the principles and ruling herein expressed, would be clearly erroneous. See C. Wright, Law of Federal Courts § 96 (3d ed. 1976).

The judgment of the Magistrate in the above-entitled proceeding must, therefore, be REVERSED.