Calvin C. HACKFORD, Plaintiff–Appellant.

v.

Bruce BABBITT, Secretary of the United States Department of the Interior; Perry Baker, Superintendent of Uintah and Ouray Indian Reservation; William Christensen, Lake Fork and Uintah River Commissioner; Bart Bennion, Project Engineer, Uintah Irrigation Project, U.S. Department of the Interior, Defendants–Appellees,

Ute Indian Tribe of the Uintah and Ouray Reservation, Amicus Curiae.

No. 92–4098.

United States Court of Appeals, Tenth Circuit.

Jan. 21, 1994.

---

Kathryn Collard (Steve Russell, with her on the briefs) of Collard & Russell, Salt Lake City, UT, for plaintiff-appellant.

Samuel C. Alexander (Myles E. Flint, Acting Asst. Atty. Gen., Edward J. Shawaker

and Samuel C. Alexander, Dept. of Justice, Washington, DC; Carlie Christensen, U.S. Attorney's Office, Salt Lake City, UT, with him on the briefs), for defendants-appellees.

Robert S. Thompson, III and Tod J. Smith of Whiteing & Thompson, Boulder, CO; and John R. Lehmer of D'Elia & Lehmer, Park City, UT, for amicus curiae.

Before BALDOCK, BARRETT and EBEL, Circuit Judges.

BARRETT, Senior Circuit Judge.

Calvin C. Hackford appeals from the district court's dismissal of his suit based upon his lack of standing under the Fifth Amendment of the United States Constitution and under the Ute Partition and Termination Act (Partition Act), 25 U.S.C. §§ 677–677aa.

## Summary of the Case

Hackford owns seven parcels of land within the Uintah and Ouray Indian Reservation in Utah. Some of these lands are irrigable and fall within an area serviced by the Uintah Irrigation Project (Project). The Project is managed by the United States Department of the Interior to deliver irrigation water to allotted lands on the reservation. On June 16, 1989, the Acting Superintendent of the Uintah and Ouray Agency directed the River Commissioner of the Lake Fork and Uintah Rivers to lock Hackford's headgates and dam his private ditch to prevent Hackford from obtaining water for irrigation until he paid the assessments in arrears for the operation and maintenance of the Project.

Following the Superintendent's action, Hackford filed suit seeking both declaratory and injunctive relief against the Secretary of the Interior (Secretary) and the other defendants in both their official and individual capacities claiming that the defendants had unlawfully (1) deprived Hackford of his interest in the operation and management of the Project in violation of the Ute Partition and Termination Act, and (2) deprived and interfered with his right to use waters reserved to the Uintah Band of Indians, of which Hackford is a member, for the irrigation of his Reservation lands in violation of the Ute Partition and Termination Act and the Fifth Amendment.

The district court dismissed the complaint on the basis that Hackford lacked standing. The district court found that although Hackford's claimed rights were based on his status as a mixed-blood member of the Ute Tribe, he had failed to either show that he represented those third-parties or that he had an individual ownership interest in the Project. This appeal followed.

## Historical Background

Under the then accepted policy of separating Indian tribes from white settlers, the Uintah Valley Reservation was created in 1861 by President Abraham Lincoln. Executive Order of October 3, 1861 *reprinted in Ute Indian Tribe v. State of Utah,* 521 F.Supp. 1072, 1157 app. A (D.Utah 1981), *aff'd in part, rev'd in part,* 773 F.2d 1087 (10th Cir.1985), *cert. denied,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). The Uncompahgre Reservation was created by President Chester A. Arthur in 1882. Executive Order of January 5, 1882 *reprinted in Ute Indian Tribe,* 521 F.Supp. at 1164 app. A. From portions of these original reservations, the current Uintah and Ouray Reservation was formed. (Brief for Appellees at 4.)

Toward the end of the nineteenth century, due to increasing western settlement by whites, federal Indian policy underwent a shift toward assimilating the Indian tribes into the mainstream culture. *See Ute Indian Tribe,* 521 F.Supp. at 1151. Responding to this shift in policy, Congress passed the Indian General Allotment Act of Feb. 8, 1887, ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. §§ 331–90). *Ute Indian Tribe,* 521 F.Supp. at 1151. The Indian General Allotment Act allowed the breakup of Indian reservations into individual homesteads on which, Congress expected, the Indians would farm and become self-sufficient. The "ultimate purpose of the [Indian General Allotment Act was] to abrogate the Indian tribal organization, to abolish the reservation system and to place the Indians on an equal footing with other citizens of the country."

*Id.* The General Allotment Act, 25 U.S.C. § 381, further provided:

> In cases where the use of water for irrigation is necessary to render the lands within any Indian reservation available for agricultural purposes, the Secretary of the Interior is authorized to prescribe such rules and regulations as he may deem necessary to secure a just and equal distribution thereof among the Indians residing upon any such reservations; and no other appropriation or grant of water by any riparian proprietor shall be authorized or permitted to the damage of any other riparian proprietor.

Following the opening of the reservation in 1905 and the distribution of allotments to the Indian bands, the Commissioner of Indian Affairs, in his annual report for 1905, described the conditions on the reservation:

> The future of these Indians depends upon a successful irrigation scheme, for without water their lands are valueless, and starvation or extermination will be their fate. The circumstances are such that delay or hesitation will be fatal because all rights to waters in Utah are based on the priority of use. It is believed that an appropriation of not less than $500,000 for irrigation for the Utes should be asked for at the next session of Congress....

Rept. of the Comm. of Ind. Aff., 1906, *quoted in Ute Indian Tribe,* 521 F.Supp. at 1126.

It was within this context that Congress authorized the construction of the Project with the Indian Department Appropriation Act of June 21, 1906, ch. 3504, 34 Stat. 325. The 1906 Act appropriated money for the "... purpose of paying the current and contingent expenses of the Indian Department, [and] for fulfilling treaty stipulations with various Indian tribes...." *Id.* at 325.

The section titled "Irrigation" provided:

> For constructing irrigation systems to irrigate the allotted lands of the Uncompahgre, Uintah, and White River Utes in Utah, the limit of cost of which is hereby fixed at six hundred thousand dollars, one hundred and twenty-five thousand dollars which shall be immediately available, the cost of said entire work to be reimbursed from the proceeds of the sale of the lands within the former Uintah Reservation:

> *Provided,* That such irrigation systems shall be constructed and completed and held and operated, and water therefor appropriated under the laws of the State of Utah, and the title thereto until otherwise provided by law shall be in the Secretary of the Interior in trust for the Indians, and he may sue and be sued in matters relating thereto:

> *And provided further,* That the ditches and canals of such irrigation systems may be used, extended, or enlarged for the purpose of conveying water by any person, association, or corporation under and upon compliance with the provisions of the laws of the State of Utah:

> *And provided further,* That when said irrigation systems are in successful operation the cost of operating same shall be equitably apportioned upon the lands irrigated, and, when the Indians have become self-supporting, to the annual charge shall be added an amount sufficient to pay back into the Treasury the cost of the work done, in their behalf, within thirty years, suitable deduction being made for the amounts received from disposal of the lands within the former Uintah Reservation. *Id.* at 375–76.[1]

■ As the Project facilities were built and irrigation water became available, non-Indians began to buy and lease allotted

---

**1.** In June 1936, the Secretary was authorized to investigate the nonpayment of irrigation charges and was given the discretion to adjust, defer, or cancel irrigation charges associated with Indian irrigation projects. Act of June 22, 1936, ch. 692, § 1, 49 Stat. 1803 (codified at 25 U.S.C. § 389). Thereafter, in 1941, because the Indians did not reach the expected level of self-sufficiency, Congress canceled a portion of unpaid construction and operation and maintenance costs to reduce the debt burden on Project lands. Act of May 28, 1941 (1941 Act), ch. 142, 55 Stat. 209. The 1941 Act confirmed the Secretary's authority to adjust irrigation charges under 25 U.S.C. § 389, transfer water to other lands within the Project, and to foreclose on Project land held by non-Indians to prevent future nonpayment of assessments. 55 Stat. 209–10.

lands.[2] *Ute Indian Tribe,* 521 F.Supp. at 1126 n. 165. Lands surrounding the reservation were also developed which created conflicts concerning the availability of water to non-Project lands. Indian lands became short of water with strict rationing the result. O'Neil & MacKay, *A History of the Uintah–Ouray Ute Lands,* American West Center Occasional Papers 34 (U.Utah 1977). In 1923, the United States filed two actions to enjoin various irrigation companies from interfering with the Indians prior use of waters of the Lake Fork, Whiterocks, and Uintah Rivers which flowed through the Project area. *United States v. Dry Gulch Irrigation Co.,* No. 4418, slip op. (D.Utah 1923); *United States v. Cedarview Irrigation Co.,* No. 4427, slip op. (D.Utah 1923); (Brief for Appellees at 7–8). The courts accorded the Indians' water use a priority date that "antedates the third day of October, 1861," the date of creation of the Uintah Valley Reservation.[3] *Dry Gulch,* No. 4418, slip op. at 2; *Cedarview,* No. 4427, slip op. at 3.

In 1934, Congress, now moving away from a policy of assimilating tribes, enacted the Indian Reorganization Act (IRA), ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. §§ 461–79). The IRA halted the allotment of tribal land and recognized the right of tribes to draw up constitutions and corporate charters for self-governance. (Brief for Appellees at 8–9.) Pursuant to the IRA, the Uintah, White River, and Uncompahgre bands formed the Ute Indian Tribe of the Uintah and Ouray Reservation in 1937. Constitution and By-laws of the Ute Indian Tribe of the Uintah and Ouray Reservation (Constitution) (Appellant's App., tab 5 ex 3.). The Constitution did not address the Project.

Thereafter, in June 1950, representatives of the members of the Uncompahgre, White River, and Uintah Bands signed a series of five tribal resolutions which completed the transition, which began with the Constitution, from loosely-knit bands to unified Ute Tribe. Armstrong Aff. and attached Resolutions (Appellant's App., tab 5 ex 4.). The resolutions divided the $31 million awarded in *Confederated Bands of Ute Indians v. United States,* 117 Ct.Cl. 433, 1950 WL 5001 (1950) for lands previously ceded to the United States. (Appellant's App., tab 5 ex 4.) *See* 25 U.S.C. § 672 (authorizing Secretary to divide trust fund belonging to Confederated Bands of Ute Indians). Further, the resolutions set out how similar claims and controversies would be handled within the Ute Tribe. (Appellant's App., tab 5 ex 4.) Under the resolutions, the entire Tribe would share equally in all tribally-held land, in any proceeds from such land, and in any claims for lands ceded to the United States which predated the formal creation of the Ute Indian Tribe without regard to band derivation. *Id.*

Federal Indian policy again underwent reform in the 1950s. *Ute Distribution Corp. v. United States,* 938 F.2d 1157, 1159 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2273, 119 L.Ed.2d 200 (1992). The federal Indian policy-makers now advocated reducing federal involvement in Indian affairs. *Id.* Between 1954 and 1956, primari-

---

**2.** The Project facilities were substantially completed by 1922. (Brief for Appellees at 6.) The Project eventually covered most of the allotted lands. It contained 22 canal systems which diverted water from most of the streams in the Uintah Basin. Today, more than one-third of the land served by the Project is held in fee by non-Indian successors to Indian allottees. *Ute Indian Tribe,* 521 F.Supp. at 1126 n. 165.

**3.** Reserved water rights have a priority date as of the date of establishment of the reservation based on the 1908 Supreme Court case of *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). *See generally* Michael C. Blumm, *Reserved Water Rights* in 4 *Waters and Water Rights* § 37.01–.02(f)(2) (Robert E. Beck ed., 1991) (describing early federal Indian policy and the roots of the reserved water rights doctrine). Reserved or "Winters" water rights are federally created and spring from the act of reserving lands for a particular purposes, such as transforming nomadic Indians into productive agrarians or promoting Indian self-sufficiency. *Id.* at § 37.02(a)–(a)(1). Unlike most other water rights, it is generally accepted that "Winters" rights held by Indians are neither created by use nor lost by nonuse. *Id. But cf. Colville Confederated Tribes v. Walton,* 647 F.2d 42, 51 (9th Cir.1981), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981), *appeal after remand,* 752 F.2d 397 (9th Cir.1985), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986) (holding that non-Indian successors obtain a reserved right with a reservation priority date but must put the reserved right to use with reasonable diligence or lose it).

ly, Congress passed a series of Indian termination statutes. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 133 n. 1, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). The Ute Partition and Termination Act (Partition Act), Act of August 27, 1954, ch. 1009, 68 Stat. 868 (codified as amended at 25 U.S.C. §§ 677–677aa), was one such statute. *Affiliated Ute Citizens,* 406 U.S. at 133 & n. 1, 92 S.Ct. at 1462 & n. 1.

Most of the termination statutes passed by Congress, including the Partition Act, contained provisions designed to terminate federal supervision over the Indians' assets. *Ute Distribution Corp.,* 938 F.2d at 1159. The Partition Act targeted the mixed-blood members of the Ute Indian Tribe of the Uintah and Ouray Reservation for termination. *Id.* The Partition Act provided for "the partition and distribution of the assets of the Ute Indian Tribe ... between the mixed-blood and full-blood members ... [and] the termination of Federal supervision over the trust, and restricted property, of the mixed-blood members ..." 25 U.S.C. § 677.

Under the Partition Act, the "full-blood" group was comprised of those individuals with at least "one-half degree of Ute Indian blood and a total Indian blood in excess of one-half." 25 U.S.C. § 677a(b). The "mixed-blood" group was comprised of those individuals who either did not possess sufficient Indian or Ute Indian blood to qualify as "full-bloods" or who became a mixed-blood member by choice under section 677c after having been initially classified as a full-blood member. 25 U.S.C. §§ 677a(c), 677c. In 1956, the Secretary published, pursuant to 25 U.S.C. § 677g, final rolls that listed 1,314 full-blood members and 490 mixed-blood members. 21 Fed.Reg. 2208–12 (April 5, 1956). Hackford, who is one-eighth Ute Indian and one-eighth total Indian ancestry, appears on the mixed-blood roll. 21 Fed. Reg. at 2209. The roll makes no reference to band affiliation.

Following publication of the rolls, the Ute Indian Tribe "consist[ed] exclusively of full-blood members," and thereafter, the mixed-blood members retained "no interest therein except as otherwise provided in [the Partition Act]." 25 U.S.C. § 677d. Also following the publication of the rolls, the division of the tribal assets began "based on the relative number of persons comprising the final membership roll of each group." 25 U.S.C. § 677i. Tribal assets were defined by the Partition Act to include, "any property of the tribe, real, personal or mixed, whether held by the tribe or by the United States in trust for the tribe, ..." 25 U.S.C. § 677a(f).

The tribal assets over which termination of federal supervision was contemplated were typically land and trust funds which could be easily divided. *Ute Distribution Corp.,* 938 F.2d at 1159. Unlike other Indian tribes terminated by Congress in 1954, the Ute tribal assets also consisted of indivisible assets, such as gas, oil, and mineral rights, as well as unadjudicated or unliquidated claims. *Id.;* 25 U.S.C. § 677i. "The indivisible assets were to remain in government trust and be jointly managed by the Tribal Business Committee and the mixed-bloods' representative." *Ute Distribution Corp.,* 938 F.2d at 1159.

Pursuant to the Partition Act, the mixed-blood members organized the Affiliated Ute Citizens (AUC) and empowered its board to act as their authorized representative. 25 U.S.C. § 677e. The AUC and the Tribal Business Committee thereafter adopted a plan to divide the tribal assets, under which the divisible assets would be transferred directly to each individual mixed-blood. *Ute Distribution Corp.,* 938 F.2d at 1159. Under the division plan, a corporation would be formed which would be responsible for managing the indivisible assets for the mixed-blood members. *Id.* See 25 U.S.C. §§ 677e, 677i.

In late 1958, the Ute Distribution Corporation (UDC) was formed, *Ute Distribution Corp.,* 938 F.2d at 1160, and the AUC, by resolution, permanently delegated to the UDC the authority to manage the mixed-blood members' share of the indivisible assets. *Affiliated Ute Citizens,* 406 U.S. at 143–44, 92 S.Ct. at 1467; *Murdock v. Ute Indian Tribe,* 975 F.2d 683, 685 (10th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993). Each mixed-blood received ten shares of UDC stock. The stock was freely transferable, with the

exception that Ute tribal members were given the right of first refusal until August 26, 1964. *Ute Distribution Corp.*, 938 F.2d at 1160.[4]

The termination of the mixed-blood members was completed when the Secretary issued a proclamation, which declared, "[a]ll statutes of the United States which affect Indians shall no longer be applicable [to the mixed-bloods.]"[5] 26 Fed.Reg. 8042 (Aug. 24, 1961). The proclamation did not end the trust status of the indivisible assets. *Ute Distribution Corp.*, 938 F.2d at 1160.

With regard to water rights, the Partition Act provided, "[n]othing in sections 677–677aa of this title shall abrogate any water rights of the tribe or its member." 25 U.S.C. § 677t. For the purpose of the division, water rights were treated as appurtenant to the lands that were divided between the groups. *See* Plan for the Division of Assets between the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah and the Affiliated Ute Citizens of the State of Utah § 10(F) (Appellees' Supp.App. item G.) For division purposes, the number of acres eligible for Project water was listed beside each land assignment. Implementing Plan at 3–27. (Appellant's App., tab 6 ex. 5).

Though the water rights were allocated between land parcels, no mention was made of a division of the Project itself or a division of the right to manage and control it. One provision of the plan refers to the method by which the operation and maintenance charges for allotted Project lands were to be allocated between the mixed-bloods and the full-bloods. Implementing Plan at 28. (Appellant's App., tab 6 ex. 5.)

Termination of the mixed-blood Utes, division and distribution of assets, and the organization of the UDC under the Partition Act has spawned extensive litigation to which this case adds a new dimension. *See e.g., Affiliated Ute Citizens*, 406 U.S. 128, 92 S.Ct. 1456 (determining that the UDC, not the AUC, is entitled to manage the oil, gas, and mineral rights with the committee of the full-bloods); *LaBaron v. United States*, 989 F.2d 425 (10th Cir.1993) (holding that the mixed-blood Utes were entitled to a hearing prior to termination of their health benefits through the Indian Health Service clinic pursuant to the Ute Termination Act); *Murdock v. Ute Indian Tribe*, 975 F.2d 683 (holding that Murdock, a mixed-blood Ute, and the AUC were collaterally estopped from relitigating the issue of whether the AUC or the UDC was the authorized organization to represent the mixed-blood Utes); *Ute Distribution Corp.*, 938 F.2d 1157 (holding that UDC distributions made to mixed-blood Ute stockholders after August 27, 1961, were subject to federal income tax); *Ute Indian Tribe v. Probst*, 428 F.2d 491 (10th Cir.1970), *cert. denied*, 400 U.S. 926, 91 S.Ct. 189, 27 L.Ed.2d 186 (1970) *and cert. denied, Moosman v. Ute Indian Tribe*, 400 U.S. 927, 91 S.Ct. 189, 27 L.Ed.2d 186 (1970) (holding that the Ute Tribe should have been given right of first refusal before mixed-blood sold land to non-Indian which had previously been distributed under the Ute Partition Act); *Affiliated Ute Citizens v. United States*, 215 Ct.Cl. 935, 566 F.2d 1191 (1977), *cert. denied*, 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978) (deciding that the mixed-blood Utes' claims against the United States for the division and distribution of water, fishing, hunting, and future growth of timber rights were barred by the

**4.** The current UDC stockholders include: the original mixed-bloods, those who have inherited stock from the original mixed-bloods, full-blood and mixed-blood purchasers, and non-Indian purchasers. *Ute Distribution Corporation*, 938 F.2d at 1160. As of 1986, of the original 490 mixed-bloods, only 160 had retained ownership of UDC stock. *Affiliated Ute Citizens v. Ute Indian Tribe*, No. 85–C–0569J, slip op. at 15 (D.Utah 1987) (Appellees' App. item H.) (appeal pending).

**5.** Termination, however, did not sever all relationships and rights of the mixed-blood members. In *United States v. Felter*, 546 F.Supp.

1002 (D.Utah 1982), *aff'd*, 752 F.2d 1505 (10th Cir.1985), the district court found that "[t]ermination ... does not equate with the destruction in fact of tribal or Indian identity, nor does it equate with the uncompensated extinguishing of vested rights in property protected by the United States Constitution." *Felter*, 546 F.Supp. at 1005. In *Felter*, the mixed-bloods' tribal hunting and fishing rights of user were not terminated by the Partition Act even though tribal affiliation and federal supervision of the mixed-blood members' assets were terminated. *United States v. Felter*, 546 F.Supp. at 1025.

six-year statute of limitations); *Affiliated Ute Citizens v. United States*, 199 Ct.Cl. 1004, 1972 WL 5188 (1972) (deciding that the mixed-blood Ute claims against the United States for division and distribution of tangible and intangible property consisting of oil, gas, and mineral rights, and unadjudicated and unliquidated claims were barred by the six-year statute of limitations); *Maldonado v. Hodel*, 683 F.Supp. 1322 (D.Utah 1988), *aff'd.*, 977 F.2d 596 (10th Cir.1990) (determining that individuals who sold their UDC stock did not retain an interest in the indivisible assets); *United States v. Felter*, 546 F.Supp. 1002 (D.Utah 1982), *aff'd*, 752 F.2d 1505 (10th Cir.1985) (determining the effect of Ute Partition Act on mixed-blood hunting and fishing rights); *Chapoose v. Clark*, 607 F.Supp. 1027 (D.Utah 1985), *aff'd, Chapoose v. Hodel*, 831 F.2d 931 (10th Cir.1987) (interpreting the Ute Partition Act with respect to subsequent tribal membership); *Hackford v. First Security Bank*, 521 F.Supp. 541 (D.Utah 1981), *aff'd*, No. 81–1863, slip op., 1983 WL 20180 (10th Cir. Jan. 31, 1983) (finding no breach of trust or violation of federal securities law in suit by minor mixed-blood Utes against trustee bank which sold shares of company formed under the Ute Partition Act for sheep grazing rights to full-blood Utes).

### *Issue on Appeal*

Whether Hackford has standing based on (1) an undivided interest as a mixed-blood member under the Partition Act to manage and control the Project, or (2) a reserved water right as a member of the Uintah Band such that he may be allowed to bypass the Project and use private irrigation ditches without payment to the Project.

### *Discussion*

### I.

Hackford argues that the proper test for standing was recently reviewed in *Housing Authority of the Kaw Tribe v. City of Ponca City*, 952 F.2d 1183 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992) (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982)). Under this test, a plaintiff must: (1) show an actual or threatened injury, (2) caused by the defendant, and (3) that a favorable judicial decision is likely to redress the injury.

Hackford contends that he meets these tests. He claims that he has suffered actual injury through his loss of crops and native grasses when the defendants locked his headgates and diverted his irrigation canals. Hackford claims that injunctive relief is likely to redress the injury by allowing him to irrigate through his private canals without interference.

Further, as a member of two non-coextensive groups, the Ute Indian Tribe and the Uintah Band, Hackford claims individual standing through those groups by demonstrating that his alleged injury is more than a generalized grievance shared by the group at large. *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 55 (D.C.Cir.1991). Hackford contends that his rights are derived from the rights of the Ute Tribe and the Uintah Band to manage and control the Project. Moreover, because he is the only person affected by the defendants' actions, the injury is personal to him. Other members of the group have not been injured and do not share his grievance.

Hackford's claim to a right in the management and control of the Project stems from the Partition Act. Hackford contends that the management and control of the Project is a *divisible* tribal asset, subject to division and distribution to the full-blood and the mixed-blood groups under the Ute Partition Act. He contends that the joint resolution of the mixed-blood and full-blood groups which divided the assets provided that each group would assume the management and control of the assets distributed to each group "upon approval of this division by the Secretary of the Interior and pending actual division."

Hackford also contends that when, in 1957, the Secretary of the Interior approved the division and distribution of the tribal assets, this included the division and distribution of the management and control of the Project to the AUC (as opposed to UDC if the man-

agement of the Project were an indivisible asset) and to the Business Committee of the Ute Tribe.

Further, Hackford contends that in 1961, when the Secretary issued the Proclamation, federal supervision of the mixed-blood group was only terminated with respect to those tribal assets which were actually distributed. Because the management and control of the Project was not actually distributed, though divided, Hackford contends that the Proclamation did not terminate the trust and fiduciary duty of the Secretary to carry out his duties to members of the mixed-blood group under the Partition Act. Moreover, according to Hackford, because the Affiliated Ute Citizens failed to distribute the individual interests in the management and control of the Project to the mixed-blood members within seven years of the passage of the Ute Partition Act, the Secretary was required but failed to so distribute these individual interests.

The appellees, though denying that the Project is a tribal asset, claim that were it a tribal asset, it would fall within the indivisible tribal asset category. The appellees contend that, because the Partition Act conferred a collective right on the Tribe and the representative of the mixed bloods to jointly manage the indivisible tribal assets, any existing joint right to manage and control the Project would therefore reside with the Tribe and the UDC only, not with Hackford as an individual. We agree.

■ "We review de novo issues such as standing that are prerequisites to this court's jurisdiction." *Kansas Health Care Ass'n v. Kansas Dep't of Social and Rehab. Servs.*, 958 F.2d 1018, 1021 (10th Cir.1992). On considering the legal sufficiency of the complaint, the burden remains with the plaintiff to assert facts sufficient to support the claim, but the court accepts as true all well-pleaded facts and construes all reasonable allegations in the light most favorable to the plaintiff. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *Hospice of Metro Denver, Inc. v. Group Health Ins. of Oklahoma*, 944 F.2d 752, 753 (10th Cir. 1991). Nevertheless, we are not bound by conclusory allegations, unwarranted inferenc-

es, or legal conclusions. *Mitchell v. King*, 537 F.2d 385, 386 (10th Cir.1976); *Ogden River Water Users' Ass'n v. Weber Basin Conservancy Dist.*, 238 F.2d 936, 940 (10th Cir.1956).

■ We agree that Hackford has stated the proper constitutional tests for standing. However, the standing "inquiry involves both constitutional limitations of federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). To meet the constitutional case and controversy requirement for federal court jurisdiction, under Article III, the plaintiff must allege, as Hackford correctly argues, personal injury caused by the defendant that is likely to be redressed by the relief requested. *Warth v. Seldin*, 422 U.S. at 498–500, 95 S.Ct. at 2204–06; *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758; *Housing Authority v. Ponca City*, 952 F.2d at 1187.

■ Beyond the constitutional limitation on standing, a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Valley Forge*, 454 U.S. at 474, 102 S.Ct. at 759 (quoting *Warth*, 422 U.S. at 499, 95 S.Ct. at 2205). This prudential limitation avoids adjudication of the rights of third parties not before the court and ensures "that the most effective advocate of the rights at issue is present to champion them." *Duke Power v. Carolina Environmental Study Group*, 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1977), *quoted in, Mountain States Legal Found. v. Costle*, 630 F.2d 754, 761 (10th Cir.1980), *cert. denied* 450 U.S. 1050, 101 S.Ct. 1770, 68 L.Ed.2d 246 (1981).

Before addressing whether Hackford is resting his claim to relief on the rights of third parties not before the court, we may make two assumptions. First, we assume, without deciding, that Hackford has met the three constitutional requirements for standing. Second, we assume that either the man-

agement and control of the Project or the Project itself is a tribal asset under the Ute Partition Act. As a tribal asset, we believe that neither the right to manage and control the Project nor the Project itself is susceptible to a neat division and distribution in the same way that land or a trust fund would be. Therefore, we are convinced that the Project would be classified as an indivisible asset rather than a divisible asset.

■ Following this logic, the right to participate in the joint management of indivisible tribal assets is a collective, not individual right. *See Affiliated Ute Citizens*, 406 U.S. at 144, 92 S.Ct. at 1467. The Partition Act, in § 677i, expressly permitted the mixed-blood group to delegate this collective management right to a corporation. The mixed-bloods thereafter irrevocably delegated to the UDC all of their rights in the joint management of the indivisible assets. *Affiliated Ute Citizens*, 406 U.S. at 136, 92 S.Ct. at 1463. The UDC issued stock to the individual mixed-bloods.

■ Those mixed-blood members who sold their UDC stock lost the accompanying right to participate in the joint management of the indivisible assets and to share in the proceeds. *Maldonado*, 683 F.Supp. at 1324, 1329. As such, the Tribal Business Committee and the UDC are the only groups which have standing or which may confer standing to their members/shareholders in a derivative capacity to claim wrongful exclusion from the management of an indivisible asset. Hackford fails to overcome the prudential limitation on standing because his rights, if any, are derived from the UDC and he does not claim that he represents the UDC in any capacity.

## II.

Hackford contends that, even assuming the Secretary is correct in continuing to hold title to the Project in trust and in managing it, the Secretary does not have legal authority to dam or divert his private ditches. Hackford contends that he did not use Project facilities and he was, accordingly, entitled to take the water directly from the river without paying an assessment. Further, Hack-

ford contends that, irrespective of the status of the Project under the Partition Act, he has a separate reserved, or *Winters*, water right as a member of the Uintah Band with a priority date of 1861. He argues that interference with his reserved right of user constitutes a taking under the Fifth Amendment to the Constitution.

Appellees contend that although Hackford may have a right of user in the water to irrigate his land, nevertheless, he may not bypass the Project delivery system to irrigate through his private ditches, thus avoiding the payment of operation and maintenance charges. Appellees contend that as a matter of law, the Secretary holds title to the Project and has express statutory authority to manage the Project and to assess operation and maintenance charges to all water users falling within its boundaries. We agree.

Though the trial court dismissed because of a lack of standing, we are not constrained by the trial court's legal conclusions. *FDIC v. Bank of Boulder*, 911 F.2d 1466, 1469 (10th Cir.1990), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991). We may affirm the district court on any grounds adequately presented to the district court. *Medina v. City & County of Denver*, 960 F.2d 1493, 1500 (10th Cir.1992). Summary judgment under Fed.R.Civ.P. 56(c) should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Hackford contends that he has a right of user to water for his irrigable lands which can be traced back through the Uintah Band to October 3, 1861 under the doctrine set forth in *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). Hackford argues that *United States v. Felter*, 752 F.2d 1505 (10th Cir.1985), *affirming*, 546 F.Supp. 1002 (D.Utah 1982), should apply to grant him standing to assert a personal right of user.

■ In *Felter*, the district court found that, because the Partition Act was silent on the termination of the mixed-blood hunting

and fishing rights, Congress did not intend to abrogate those rights. *Felter*, 546 F.Supp. at 1018. In *Felter*, the right to hunt and fish was recognized as a tribal right over which unified control and management was necessary. *Id.* at 1025. The individual mixed-blood had a right of user in the tribal right, which was a personal right but one which was subject to tribal regulation. *Id.* at 1024. The personal right of user concept protects tribal authority over its own tribal rights while allowing for uniform regulation of their exercise. *Id.* at 1025. In regulating, the Tribe may not discriminate against persons holding these rights. *Id.* at 1025 n. 54.

■■■■■ The Partition Act, while silent as to the hunting and fishing right in *Felter*, expressly addressed water rights in 25 U.S.C. § 677t, which provided: "Nothing in this subchapter shall abrogate any water rights of the tribe or its members." Here, it is uncontested that Hackford has a right of user to irrigation water. Moreover, the Secretary admits that the water rights under the Partition Act were treated as appurtenant to the lands distributed under the Partition Act. (Brief for Appellees at 12–13.) Therefore, we conclude that Hackford has standing under the Partition Act derived through his right of user to water for irrigation. Hackford's right of user, however, is based on a tribal right. As such, it can be subjected to a uniform regulation of its exercise without triggering the Fifth Amendment takings clause. *See Felter*, 546 F.Supp. at 1024.

Although we conclude that Hackford has standing to assert a tribal right, two legal subissues remain to be resolved. In order for the Secretary to lawfully charge Hackford irrigation assessments and divert his private ditches, (1) the Secretary must hold the Project in trust and have statutory authorization to manage the entire irrigation flow within the Project boundary, and (2) Hackford must not have a separate right of user derived from the Uintah Band which allows him to bypass the Project facilities and take water without paying a Project assessment.

6. The case of *Winters*, 207 U.S. 564, 28 S.Ct. 207, which established a federal reserved water right,

a.

The Secretary's initial authority to manage irrigation of Indian lands can be traced back to the General Allotment Act of 1887. Act of February 8, 1887, ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. §§ 331–90). The General Allotment Act's goal was to end tribal ownership of land by assimilating Indians as part of an agrarian society. *See Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 650 n. 1, 96 S.Ct. 1793, 1794 n. 1, 48 L.Ed.2d 274 (1976); *Ute Indian Tribe*, 521 F.Supp. at 1151. To this end, the General Allotment Act authorized the Secretary "to prescribe such rules and regulations as he may deem necessary to secure a just and equal distribution [of irrigation water] among the Indians residing ... upon reservations." 25 U.S.C. § 381.

Later, as more Indians were attempting to farm their allotted arid lands, it became apparent that an irrigation project was not only necessary to successfully assimilate the Indians as farmers and ranchers but was critical to keep the people from starvation. *Ute Indian Tribe*, 521 F.Supp. at 1126. Moreover, officials on the reservation believed that state water law would be applied to the Indian reservation and that, without irrigation and water rights protection, the Indians would be left out of the Utah state scheme based on priority of use. *Ute Indian Tribe*, 521 F.Supp. at 1126.[6] Responding to the desperate situation on the reservation, Congress quickly authorized the creation of the Project for the purpose of providing irrigation to lands which had been allotted to the Uncompahgre, Uintah, and White River Utes under the General Allotment Act. *Ute Indian Tribe*, 521 F.Supp. at 1126 & n. 165.

■■■ From the Project's inception, Congress envisioned that the Secretary (1) would construct, complete, hold, and operate the Project, (2) would hold title to the Project in trust for the Indians until otherwise provided by law, (3) could prescribe such rules and regulations, under the General Allotment

was not decided until 1908.

Act, as he may deem necessary to secure a just and equal distribution of irrigation water among the Indians on the reservation, and that (4) the cost of operating, and ultimately some of the cost of constructing, the Project would be equitably apportioned upon the lands irrigated through an annual fee.

Later Congressional action confirmed the Secretary's authority to manage the Project and to charge assessments for the irrigation of allotted lands on the reservation. *See* 25 U.S.C. §§ 385, 389; The Act of May 28, 1941, ch. 142, 55 Stat. 209. ·

Under the Partition Act, the Secretary's authority to manage the Project and assess charges was unaffected. In comparing the Partition Act and the 1906 Act, the Partition Act defined "asset" as "any property of the tribe, real, personal or mixed, whether held by the tribe or by the United States in trust *for the tribe...*" 25 U.S.C. § 677a(f). The 1906 Act provided for construction of a system held in trust "to irrigate the *allotted lands* of the ... Utes," 1906 Act, 34 Stat. at 375. (emphasis added). Allotted lands refers to lands held in severalty by individual Indians. *See Hollowbreast,* 425 U.S. at 650 & n. 1, 651, 96 S.Ct. at 1794, n. 1, 1795; *Affiliated Ute Citizens,* 406 U.S. at 142, 92 S.Ct. at 1466; *see also* Ute Constitution art. VIII, §§ 1, 2 (Appellant's App. tab 5, ex. 3 (defining tribal and allotted lands.) Tribal lands, on the other hand, consisted of the *unallotted* lands of the reservation.

■■■ Likewise the Partition Act did not change the trust relationship set up by the 1906 Act. The 1906 Act provided that *"until otherwise provided by law,"* the Secretary shall hold title to the Project in trust for the Indians. 34 Stat. at 375 (emphasis added). Absent express language in the Partition Act concerning the Project itself, the phrases "in trust for the Indians" in the 1906 Act is not coextensive with "in trust for the tribe" in the Partition Act in light of the purposes behind each Act. The 1906 Act's purpose was to provide irrigation for the allotted, not tribal, lands. The Ute Partition Act's purpose was to divide the tribal assets, including

the tribal lands, between the full and mixed-bloods, without effect on the allotted lands.

The recently enacted Reclamation Projects Authorization and Adjustment Act of 1992, Pub.L. No. 102–575, § 203(f)(2), 106 Stat. 4614, provided that: "[t]itle to the Uintah Indian Irrigation Project rights-of-way and facilities shall remain in the United States," and that "[t]he Secretary shall retain any trust responsibilities to the Uintah Indian Irrigation Project."

Pursuant to 25 U.S.C. § 385, the Secretary promulgated regulations governing the operation and maintenance of the Project. 25 C.F.R. §§ 171–171.23. These regulations specify that "operation and maintenance assessments will be levied against ... allotment[s] ... designated as assessable and to which water can be delivered by the project operators from the constructed works whether requested or not, 25 C.F.R. § 171.19, and that "[i]rrigation water will not be delivered until the annual operation and maintenance assessments are paid." 25 C.F.R. 171.17(a). *See* 25 C.F.R. 171.1(a). Under these regulations, Hackford's land is designated for water delivery for which he can be charged operation and maintenance assessments.

Moreover, it is significant that the Ute Indian Tribe recognizes the Secretary's authority to manage the Project because, though the individuals with irrigable land may have a right of user to the water, the water right itself is a tribal right. *See* Amicus Curiae Brief of the Ute Indian Tribe. A tribal right can be subjected to a uniform regulation of its exercise.

b.

Hackford argues that his right of user to irrigation water has an earlier priority date and is separate from the water flowing within the Project such that he should not be required to use the Project facilities or pay a Project assessment. Further, Hackford argues that his reserved water derived from the Uintah Band [7] has a priority date of 1861, the date of the reservation while the water

---

**7.** We need not decide whether the Uintah Band had a separate water right distinct from that of the Ute Tribe following the formation of the Ute

Tribe and the adoption of the tribal resolutions. *See* Armstrong Aff. and attached Resolutions (Appellant's App., tab 5 ex. 4).

going to allottees has a later priority date based on the date the allotments were made.

In 1923, in *United States v. Dry Gulch*, No. 4418, slip op. and *United States v. Cedarview Irrigation Co.*, No. 4427, slip op., which granted the United States injunctions against interference with Project water, the United States argued that the water flowing through the Project irrigation systems was Indian reserved water under *Winters*, 207 U.S. 564, 28 S.Ct. 207, entitled to a October 3, 1861, priority date. The district court recognized this priority date and divided the available water between the Indian and non-Indian lands.

When the United States set aside and reserved land for the Indians, it also impliedly reserved sufficient water to accomplish the purposes for which the reservation was established. *Winters*, 207 U.S. at 577, 28 S.Ct. at 212. Even though the water flowing through the reservation may have been unappropriated, the right to it vests no later than the creation of the reservation. When the reservation land was allotted, and the Project developed, the allottees acquired the right to use a portion of the tribe's reserved water right with a priority date no later than the creation of the reservation. *United States v. Powers*, 305 U.S. 527, 532–33, 59 S.Ct. 344, 346, 83 L.Ed. 330 (1939). Therefore, Hackford's right of user, whether derived from the Uintah Band or Ute Tribe, has the same priority date as that delivered through the Project to allotted lands.

The Secretary is charged with securing a just and equal distribution of irrigation water to lands on the reservation. This would be impossible to accomplish if certain individuals were allowed to bypass the Project facilities and irrigate through private ditches and canals. The Secretary's authority to successfully manage and operate the Project must encompass authority over all of the irrigable land which falls within the Project boundaries.

We hold that the Secretary has the authority to manage the Project and to assess Hackford maintenance and operation costs for using water to irrigate his lands within the boundaries of the Project.

We AFFIRM.